Jessie J. BARNES, 09–B–2707, Plaintiff,

v.

COUNTY OF MONROE,
et al., Defendants.

No. 10–CV–6164 EAW.

United States District Court,
W.D. New York.

Signed Feb. 10, 2015.

Jessie J. Barnes, Malone, NY, pro se.

Mallorie C. Rulison, Monroe County Department of Law, Rochester, NY, for Defendants.

## DECISION AND ORDER

ELIZABETH A. WOLFORD, District Judge.

### INTRODUCTION

Plaintiff Jessie James Barnes ("Plaintiff"), proceeding *pro se,* is an inmate currently housed at Upstate Correctional Facility. Plaintiff brings the instant action pursuant to 42 U.S.C. § 1983, alleging that Defendants committed various violations of Plaintiff's state and constitutional rights while he was detained at the Monroe County Jail ("MCJ") during 2008 and 2009.

Presently before the Court is the motion by Defendants County of Monroe, Monroe County Executive Maggie Brooks, Monroe County Sheriff Patrick M. O'Flynn, MCJ Superintendent Ronald Harling, Major E. Krenzer, Major Caceci, Captain Jolly, Captain Thomas, Lieutenant Dimartino, Lieutenant Lipari, Lieutenant Horan, Lieutenant Kaiser, Lieutenant Kloner, Sergeant

DeRosa, Sergeant Mooney, Sergeant McGowan, Sergeant Hayes, Corporal Kimball, Corporal Gatti, Corporal Guest, Corporal Knapp, Corporal Cardella, Corporal Amatore, Corporal Kennelly, Corporal Pratt, Corporal Inipoli, Corporal Preston, Corporal T. Peck, Corporal S. Peck, Corporal Shellard, Corporal Carlo, Corporal Tripoli, Corporal Messura, Deputy Kluth, Deputy Scally, Deputy Luther, Deputy Atkins, Deputy Newton, Deputy Willis, Deputy Waud, Deputy James Amico, Deputy Ellen Danehy, Deputy Isiah Raby, Deputy Fitzsimmons, Deputy Palma, Deputy Daly, Deputy Galen, Deputy DiFlores, Deputy Alberti, Jane Doe Nurse, Nurse Mary, Greg Domalski, Bradley Meister, Avis Robinson, E. Holman, Letitia Miller, Michelle Rizzo, and Todd Thibaut ("County Defendants")[1] for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c) (Dkt. 119), Defendant Ellie Holman's separate motion for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c) (Dkt. 120),[2] Plaintiff's motion for recusal (Dkt. 142), and Plaintiff's request to convert Defendants' motions for judgment on the pleadings into a motion for summary judgment (Dkt. 133).

For the following reasons, the County Defendants' motion (Dkt. 119) is granted in part and denied in part, Defendant Holman's motion (Dkt. 120) is granted, and Plaintiff's request to convert Defendants' motion for judgment on the pleadings into a motion for summary judgment (Dkt. 133) is denied. In addition, Plaintiff's motion for recusal (Dkt. 142) is denied.

## PROCEDURAL BACKGROUND

Plaintiff filed his original complaint in this matter on March 22, 2010, alleging numerous causes of action against approximately 88 Defendants, along with an application to proceed *in forma pauperis*. (Dkt. 1, 2). On April 1, 2010, the Court granted Plaintiff leave to proceed *in forma pauperis*. (Dkt. 3). In that order, the Court also dismissed Defendants Ontario County and Ontario County Attorney as parties to this action. (*Id.*).

Plaintiff filed a motion to appoint counsel on April 28, 2010 (Dkt. 4), and on May 17, 2010, the Court denied his motion (Dkt. 5).

On July 6, 2010, the County Defendants filed a motion to dismiss. (Dkt. 6). On July 27, 2010, the Court added Corporal Messura as a Defendant. (Dkt. 10). Plaintiff moved to amend his complaint on August 3, 2010. (Dkt. 12). On October 6, 2010, Defendants Beilein, Harrison–Ross, and Stewart filed a motion for summary judgment. (Dkt. 18). On December 27, 2010, Plaintiff filed another motion to

---

1. Although Defendants Kloner, Inipoli, DiFlores, Nurse Mary, and Jane Doe Nurse are each listed in the caption to this action, at no time throughout Plaintiff's third amended complaint does he allege that these individuals engaged in any activity or violated Plaintiff's rights under state or federal law. As a result, these Defendants are dismissed. *See Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § ·1983.") (quotation omitted).

Further, service of the summons and complaint in this matter was never made upon Defendant Palma. Pursuant to Fed.R.Civ.P. 4(m), service of the summons and complaint must be made upon a defendant within 120 days after their filing. Plaintiff has not shown good cause for his failure to serve Defendant Palma, but simply claims that the Clerk of the Court "failed to make service" on Defendant Palma. (Dkt. 133–1 at 3; 133–3 at 23). Accordingly, Defendant Palma is dismissed.

2. Cynthia L. Muller is also listed as a Defendant on this motion, however, Plaintiff voluntarily dismissed Ms. Muller with prejudice, and Ms. Muller was dismissed by Court order on July 12, 2013. (Dkt. 135).

amend his complaint. (Dkt. 27). On July 26, 2011, Plaintiff voluntarily dismissed Defendants Beilein, Harrison–Ross, Stewart, and the Citizen's Policy and Complaint Review Council, and the Court dismissed these parties with prejudice by Court order. (Dkt. 60, 61). On January 11, 2012, 2012 WL 92553, the Court issued an order granting Plaintiff's motion to amend his complaint (Dkt. 27), and dismissing as moot Plaintiff's additional motion to amend (Dkt. 12) as well as the County Defendants' motion to dismiss (Dkt. 6). (Dkt. 62).

On January 25, 2012, Plaintiff filed his second amended complaint. (Dkt. 64). On March 22, 2012, the Court ordered that Plaintiff's second amended complaint be amended to insert the name of Cynthia L. Muller in place of the aforementioned Jane Doe nurse. (Dkt. 78). On April 10, 2012, the County Defendants filed a motion for judgment on the pleadings. (Dkt. 82). On June 6, 2012, the Court ordered that Defendants Greg Domalski, Bradley Meister, Avis Robinson, Deputy Fitzsimmons, James Amico, and Deputy Ellen Danehy be added as Defendants in place of formerly named John Does. (Dkt. 92). Plaintiff filed a motion to amend his complaint on July 26, 2012. (Dkt. 96). On August 1, 2012, Defendants Mary Ann McQueeney and Debbie Scarpulla, two nurses employed by Correctional Medical Care, Inc. ("CMC"), filed a motion to dismiss the claims against them. (Dkt. 97).

On August 2, 2012, the Court granted Plaintiff's request to file a third amended complaint, making Plaintiff's third amended complaint the operative pleading for this matter. (Dkt. 99).

On August 2, 2012, the Court dismissed Defendants McQueeney, Scarpulla, Bye, Showers, Schultz, Wheatley, Burns, Caviccholi, Harris, Knox, Lopez, Chance, Gallina, and Potocki in accordance with Plaintiff's voluntary dismissal of these De-

fendants. (Dkt. 100). The outstanding motion for judgment on the pleadings (Dkt. 82) and motion to dismiss (Dkt. 97) were denied as moot. (Dkt. 99).

On February 4, 2013, the County Defendants filed a motion for judgment on the pleadings (Dkt. 119), and the remaining Defendants, Holman and Muller, filed a motion to dismiss for failure to state a claim (Dkt. 120).

The County Defendants filed a motion to stay discovery on March 7, 2013. (Dkt. 125). The remaining Defendants filed a declaration in support of this motion to stay discovery on March 13, 2013. (Dkt. 127).

On June 19, 2013, Plaintiff filed his response to Defendants' motions and requested that the County Defendants' motion be converted into a motion for summary judgment and be granted in his favor. (Dkt. 133).

On July 11, 2013, the Court dismissed Defendant Muller in accordance with Plaintiff's voluntary dismissal of this Defendant. (Dkt. 135).

The Court granted Defendants' motion to stay discovery (Dkt. 125) on September 19, 2013, 2013 WL 5298574 (Dkt. 138). On February 13, 2014, the Honorable Charles J. Siragusa, United States District Judge for the Western District of New York, transferred this case to the undersigned. (Dkt. 141).

On January 13, 2015, Plaintiff filed a motion for the recusal of the undersigned. (Dkt. 142).

### FACTUAL BACKGROUND

Plaintiff's third amended complaint against the remaining 58 Defendants asserts the following facts. (Dkt. 95).

In or about July 2008, Plaintiff was arrested, charged with burglary, and re-

manded to MCJ pending trial. (*Id.* at ¶ 20).

On August 7, 2008, Plaintiff was fighting with two other inmates, Trustee Eades and Tyrone Members, when Defendant Newton jumped on Plaintiff's back, struck Plaintiff in the mouth, and knocked out one of Plaintiff's front teeth. (*Id.*). Plaintiff alleges that Defendant Newton "premeditated" the attack on Plaintiff, and that Defendants Amico and Danehy "collaborated" with Defendant Newton to delay the call of a "Code 1," allowing Plaintiff to be attacked by the other inmates. (*Id.* at ¶¶ 30–32). Plaintiff claims that inmate Eades' cousin told Plaintiff on June 12, 2009, that Defendant Newton was aware that inmates Eades and Members were going to "attack" Plaintiff and indicated that he would "take care of the Code # 1 response and finish the plaintiff off himself." (*Id.* at ¶ 32).

As a result of the August 7, 2008 altercation, Plaintiff was placed in the special housing unit ("SHU") by Defendants Luther, Newton, DeRosa, Jolly, Krenzer, Horan, Kaiser, and Dimartino. (*Id.* at ¶ 75). Plaintiff was housed in SHU from August 7, 2008 through August 21, 2008, under full mechanical restraints and under a shower and exercise deprivation order. (*Id.*).

Although it was not specified in the complaint, Plaintiff must have been released at some time after August 21, 2008, because on October 9, 2008, Plaintiff was arrested after a high-speed chase and was again detained at MCJ on charges of burglary and reckless endangerment, awaiting his July 13, 2009 trial. (*Id.* at ¶ 21).

On October 11, 2008, Defendants DeRosa, Horan, and Jolly placed Plaintiff in SHU. (*Id.* at ¶ 22). Plaintiff alleges that Defendant DeRosa placed him in SHU in retaliation for the burglary of a family member that may have been committed by Plaintiff. (*Id.* at ¶ 76). Plaintiff further alleges that his placement in SHU violated his rights to due process. (*Id.* at ¶ 77). On October 16, 2008, Defendant Krenzer sent Plaintiff a memo indicating: "The circumstances of your arrest and institutional history justify actions taken and measures to isolate you." (*Id.* at ¶ 62). On October 20, 2008, Plaintiff sent "an appeal" to Defendant O'Flynn, complaining that Defendants DeRosa and Krenzer were discriminating against him and denying him due process. (*Id.* at ¶ 63). Plaintiff alleges that he sent a copy of his complaint to Defendant Brooks on March 17, 2009. (*Id.* at ¶ 25). Plaintiff further claims that he submitted a notice of temporary restraining order and preliminary injunction to Defendant Brooks on April 20, 2009, concerning Plaintiff's allegations of discrimination and denial of due process. According to Plaintiff, he effectuated service of a notice of claim on Defendant County of Monroe on June 29, 2009, (*Id.* at ¶ 27), and an Article 78 petition on August 5, 2009 (*id.* at ¶ 28).

Plaintiff claims that housing sections 2, 2M, 3, and 3M in MCJ were areas known to have "gang activity," and that Defendants Thomas, Jolly, Dimartino, Horan, Kaiser, Hayes, Mooney, DeRosa, McGowan, Kimball, Knapp, Cardella, Kenelly, Tripoli, S. Peck, and Carlo discriminated against Plaintiff by placing him in this housing "where gang activity is prevalent and rampant or hostile situations are most likely to occurr[sic] with the Black or Hispanic ethnicity inmates of particular profile and character they deliberately and indifferently assemble in small area with same or similar tendencies and propensities for transgressions or violence...." (*Id.* at ¶ 61). Plaintiff claims that Defendants do not place Caucasian inmates in this housing. (*Id.* at ¶ 71). Plaintiff contends that Defendants O'Flynn, Brooks, and Harling have "acquiesced" in Monroe County's alleged discriminatory "policy, practice, or

custom" of housing minorities together in MCJ. (*Id.* at ¶¶ 25–26, 48, 57, 61, 72–73, 94–96).

On November 7, 2008, Defendant Krenzer placed Plaintiff in second floor housing. (*Id.* at ¶ 0). On November 18, 2008, Plaintiff was beaten by "two (2) younger minorities," Acvin King and M. Jones. (*Id.* at ¶ 41). On November 19, 2008, Defendant DeRosa placed Plaintiff in SHU and allegedly stated: "They should have jumped you, you stabbed that kid in the face with a pencil the whole pitt[sic] should have kicked your ass." (*Id.* at ¶ 64). Plaintiff claims that Defendants DeRosa, Horan, Kaiser, Jolly, Amatore, Krenzer, Caceci, and Harling discriminated against Plaintiff by putting him in SHU because there is videotape evidence of King "mercifullessly[sic] repeatedly kicking the plaintiff in his face as he lie on the floor." (*Id.* at ¶¶ 65, 77). Plaintiff claims that he was supposed to be released from SHU on December 17, 2008, but was kept in SHU until December 23, 2008, "without adequacy of any due process of law." (*Id.* at ¶ 77). Plaintiff contends that he notified Defendants O'Flynn, Harling, and Krenzer that he was improperly placed in SHU, but that these individuals "failed to remedy the wrong." (*Id.* at ¶ 78).

After his release from SHU on December 23, 2008, Plaintiff claims that he was placed in a cell that was "atrociously unsanitary disgustingly filthy with excrement, urine, feces and spew all over walls, ceiling, floor and bars for (3) three more consecutive days where ventilation system were non-existent and cell smell toxicly[sic] aweful[sic] ..." by Defendants Jolly, Horan, Kaiser, DeRosa, McGowan, Knapp, Kennelly, Cardella, S. Peck, and Tripoli. (*Id.* at ¶ 60).

On December 26, 2008, Plaintiff informed Defendant Tripoli that he did not want to return to the mainframe housing area, and according to Plaintiff, Tripoli responded: "I don't give a fuck how many times you got your ass kicked on main-frame we have decide[d] that you will only be placed in a cell on the main-frame and no place else, either you go to 3M or I will put you back in SHU." (*Id.* at ¶ 66). On January 19, 2009, Plaintiff was attacked by three other inmates. (*Id.* at ¶ 43). Plaintiff claims that Defendants Waud and Willis "bragged" about Plaintiff getting beaten up on this occasion. (*Id.* at ¶ 44).

On February 26, 2009, Plaintiff claims that he asked Defendant Waud to lock him in his cell with a large bag of commissary items at approximately 8:30 p.m. (*Id.*). Plaintiff then alleges that at approximately 9:00 p.m., Defendant Waud opened all of the cells, and Plaintiff left for a short time to brush his hair. (*Id.* at ¶ 45). When Plaintiff returned, his belongings were in disarray, and a "large amount" of commissary was taken from his cell. (*Id.*). Plaintiff claims that inmates Frye, Spivey, Ali, and Houston stole his property, and that this theft would appear on videotape. (*Id.* at ¶¶ 45, 47).

Plaintiff alleges that Defendant Waud permitted the theft of commissary to occur in retaliation for Plaintiff's filing of grievances, as evidenced by Defendant Waud's statement that he hated Plaintiff because "he is a piece of shit that likes to file grievances on staff." (*Id.* at ¶ 46). Plaintiff alleges that Defendants Waud, T. Peck, Mooney, Dimartino, Robertson, and Fitzsimmons "collaborated reports" to delete any references to the theft of Plaintiff's commissary. (*Id.* at ¶ 47). Plaintiff contends that Defendants Krenzer, Harling, Jolly, Dimartino, Mooney, T. Peck, Waud, Fitzsimmons, and Robinson altered the videotape evidence by deleting from the tape the time period from 8:55 p.m. through 9:30 p.m. (*Id.* at ¶ 101). Plaintiff further claims that Defendants Harling, Krenzer, Thomas, and Jolly encouraged

the falsification of records relating to the incident. (*Id.* at ¶ 48). According to Plaintiff, Defendant Monroe County continues to withhold the videotape evidence, which Plaintiff claims is in the possession of Defendants Amico, Danehy, Meister, Domalski, Miller, Rizzo, Fitzsimmons, and Robinson. (*Id.* at ¶¶ 100, 102).

Although Plaintiff does not explain what happened after the alleged theft of his commissary was discovered, Plaintiff alleges that he was taken out of the booking area on a stretcher following the incident. (*Id.* at ¶ 49). As Plaintiff was carried out on a stretcher, Plaintiff claims Defendant DeRosa called out: "Hey Jessie I see you got your ass kicked that is good for you they did a pretty good job this time." (*Id.*). When Defendant Raby asked Plaintiff how many inmates jumped him, Defendant Holman allegedly stated: "Oh Jessie Barnes always gets his ass kicked." (*Id.* at ¶ 53).

Plaintiff alleges that Nurse Muller deliberately omitted from her February 26, 2008 medical notes the fact that Plaintiff was vomiting blood, with the intention of downplaying his injuries. (*Id.* at ¶ 103). Plaintiff voluntarily dismissed Ms. Muller as a defendant to this action with prejudice, and Ms. Muller was dismissed from this matter by Court order dated July 12, 2013. (Dkt. 135).

Between February 27, 2009 and March 2, 2009, Plaintiff was housed in a booking cell, and was allegedly kept on a shower and exercise deprivation order by Defendants T. Peck, Mooney, Waud, Dimartino, and Jolly. (Dkt. 95 at ¶ 79).

On an unspecified date, Plaintiff alleges that Defendant Kluth "humiliated and degraded" Plaintiff for "5 or 6 consecutive hours" after Defendant DeRosa pointed at Plaintiff, and subsequently issued two false misbehavior reports against Plaintiff. (*Id.* at ¶ 67).

On March 2, 2009, before being placed in SHU, Plaintiff was subjected to a "degrading and humiliating strip-search" by Defendant Scally. (*Id.* at ¶ 69). Plaintiff claims that he filed a grievance against Defendant Scally on March 3, 2009, and later that day, Defendant Scally approached Plaintiff's cell and "blew-up his cheeks making jestures[sic] and stated: 'Oh Jessie suck my dick.'" (*Id.* at ¶ 92). Plaintiff claims that Defendants Atkins, Scally, Guest, Amatore, and McGowan then filed a false misbehavior report against Plaintiff in retaliation for Plaintiff's grievance against Defendant Scally. (*Id.* at ¶ 93). As a result of this misbehavior report, Defendants Hayes, Horan, Jolly, McGowan, Guest, Scally, Atkins, and Krenzer placed Plaintiff in SHU on a shower and exercise deprivation order for over 30 consecutive days, causing Plaintiff "extreme outrageous emotional distress, physical suffering and mental anguish." (*Id.* at ¶ 80). Plaintiff claims to have contested this determination but his grievance and subsequent appeal were denied. (*Id.* at ¶ 81).

According to Plaintiff, Defendants Krenzer and Thomas told Plaintiff that the 30–day order "may have been a bit much," and that he would be taken out of SHU on April 13, 2009, if he did not have "any write ups or bad reports." (*Id.* at ¶ 82). Plaintiff claims that Defendant Atkins intentionally "documented degenerate asnine[sic] notes, log entries, segregation reports and e-mails" between April 9, 2009, and April 12, 2009, to prevent Plaintiff's early removal from SHU. (*Id.* at ¶ 83).

Plaintiff alleges that his original petition to state court was notarized on April 15, 2009, by the law librarian, and that when copies of the petition were delivered to Plaintiff's cell on April 16, 2009, Defendant Atkins saw the petition. (*Id.* at ¶ 85). Plaintiff alleges that another false misbe-

havior report was issued against Plaintiff on April 16, 2009, in retaliation for Plaintiff's state court petition. (*Id.* at ¶ 86). As a result of this misbehavior report, Defendants Newton, Horan, Jolly, and Krenzer placed Plaintiff on a shower and exercise deprivation order. (*Id.*). Plaintiff claims to have filed an administrative appeal with Defendant Harling on April 17, 2009, with respect to the new deprivation order and his concerns about the false misbehavior report. (*Id.* at ¶ 87). Defendant Harling responded on April 21, 2009. (*Id.*).

Plaintiff claims that he was required to remain in full mechanical restraints during his isolated morning exercise period from March 2009 until August 31, 2009, and that this requirement constituted cruel and unusual punishment and violated his rights under the due process and equal protection clauses of the New York State and United States Constitutions. (*Id.* at ¶ 88).

On May 2, 2009, Plaintiff claims that Defendant Willis let inmate Clark out of his cell and instructed the inmate to throw "urine, feces, and dirty mop water in the plaintiff's cell," endangering Plaintiff's life, health, and safety. (*Id.* at ¶ 54). Plaintiff further claims that Defendant Willis took Plaintiff's personal towel that held sentimental value and threw the towel into the urine and feces. (*Id.* at ¶ 55). Plaintiff alleges that later that day Defendant Willis stood in front of Plaintiff's cell with inmate Clark and Defendant Gatti when Defendant Gatti, whom Plaintiff had never seen before, called Plaintiff a "nigger" and said that he would kill Plaintiff. (*Id.* at ¶ 56).

On May 4, 2009, Defendants Scally, Amatore, and Atkins allegedly filed a false misbehavior report against Plaintiff, which caused Plaintiff to be placed on a 23–day consecutive "styro-foam tray order," in retaliation for Plaintiff "seeking redress of grievances in judicial and administrative forums." (*Id.* at ¶¶ 58, 90).

On August 12, 2009, Plaintiff alleges that he was participating in his one hour of exercise when Defendant Daly harassed Plaintiff about Plaintiff's upcoming parole hearing. (*Id.* at ¶ 33). Following this encounter, Plaintiff requested to speak with a supervisor, and was placed in a no-contact visitation cell for 45 minutes. (*Id.* at ¶ 34).

Later that day, Defendant Daly entered the visitation room at the end of Plaintiff's 50(h) deposition with the Ontario County Attorney. (*Id.* at ¶ 35). According to Plaintiff, Defendant Shellard also entered the room, and when Plaintiff reached for his legal documents, Defendant Shellard pushed Plaintiff face-first into the glass window. (*Id.*). Defendants Shellard, Daly, and Alberti then allegedly pushed Plaintiff to the floor, kicked, stomped on, and punched Plaintiff, although he was in full restraints. (*Id.* at ¶ 36). Plaintiff claims that Defendants Alberti and Daly used the handcuffs to "inflict pain and suffering on [Plaintiff] causing him to lose the feeling in his hands." (*Id.* at ¶ 37).

Plaintiff alleges he was then taken to the elevator, where Defendant Lipari was standing shaking a canister of mace and watching Plaintiff. (*Id.*). After the elevator arrived at the second floor, Plaintiff claims he was pushed into the hallway. (*Id.* at ¶ 38). Plaintiff claims that he tried to steady himself by grabbing the gate and that Defendant Galen told him not to touch the gate, and that Defendants Alberti and Daly then grabbed Plaintiff and slammed his head. (*Id.* at ¶¶ 38–39). Plaintiff claims that he urinated and defecated on himself, and experienced dizziness and a concussion. (*Id.* at ¶ 39). Plaintiff was then allegedly dragged back to his cell by Defendants Galen, Daly, and Alberti. (*Id.*).

Plaintiff also complains about conditions of confinement at MCJ. Plaintiff claims that Monroe County failed to properly

train or supervise Defendants Brooks and O'Flynn, resulting in the "gross negligent management" of various officers, and ultimately violations of Plaintiff's constitutional rights. (*Id.* at ¶¶ 48, 57, 61, 89, 97). For example, Plaintiff alleges that the County's failure to properly train or supervise Defendants Brooks and O'Flynn led to their negligent management of Defendants Harling and Krenzer, who permitted Plaintiff to be housed in the mainframe section of housing at MCJ. (*Id.* at ¶ 61).

In that same vein, Plaintiff generally claims that Defendant County of Monroe has maintained a discriminatory classification policy for over fifteen years at MCJ. (*Id.* at ¶ 71). Specifically, Plaintiff alleges that this policy involves placing all minorities in SHU for "minor or miscellaneous rule violations" resulting in the minorities' denial of access to public information. (*Id.* at ¶ 72). Further, Plaintiff claims that the conditions in SHU are extreme, insofar as the "5 ft. long lights just 3 ft. above bed remain on 24 hrs. a day no matter how hot temperature is outside and these bright lights causes [sic] sleeplessness excruciating head-aches, eye pains, anxiety, mental anguish and endless pain and suffering." (*Id.* at ¶ 73). Plaintiff claims that minorities are disproportionately exposed to these extreme conditions. (*Id.*).

In addition, Plaintiff claims that the County of Monroe maintains a defective grievance program at MCJ, insofar as there is bias in the program that denied Plaintiff his right to "petition government for redress of grievances under administrative forum." (*Id.* at ¶¶ 91, 95–97).

Plaintiff claims that he has filed numerous grievances, complaints, and appeals with Defendants Harling and Krenzer in relation to the alleged mistreatment by Defendants Atkins, Scally, Newton, Willis, Guest, Amatore, and DeRosa, but states that Defendants Harling and Krenzer have continued to show "deliberate indifference" to Plaintiff's concerns. (*Id.* at ¶ 59).

Plaintiff claims that Defendants Lipari and Harling provided fraudulent responses to Plaintiff's grievance 09–33, and excluded four witness statements in connection with Plaintiff's grievance 09–49, contributing to Defendant County of Monroe's "faulty" grievance program. (*Id.* at ¶ 94).

Plaintiff alleges that Defendants Lipari, Guest, S. Peck, and Shellard did not appropriately conduct their investigations against supervisors in relation to Plaintiff's grievances 09–01, 09–32, 09–35, 09–46, 09–49, 09–81, 09–88, and 09–89, in violation of Plaintiff's rights under 7 NYCRR § 701.8(d)(1) and the First and Fourteenth Amendments to the U.S. Constitution. (*Id.* at ¶ 95).

Plaintiff generally claims that the investigation into his grievance 09–01 was biased and prejudiced, in violation of his right to seek redress of grievances. (*Id.* at ¶ 96).

Plaintiff alleges that he was denied due process of law at nine disciplinary hearings. (*Id.* at ¶ 97). Plaintiff claims that eight separate provisions of the NYCRR were violated by Defendants Messura, Preston, and Pratt at these hearings. (*Id.*). Plaintiff further claims that Defendants Krenzer and Harling were notified of these violations through Plaintiff's appeals, but that Defendants were deliberately indifferent to Plaintiff's complaints and failed to remedy the wrong. (*Id.* at ¶ 98).

## DISCUSSION

Rule 12(c) motions for judgment on the pleadings are evaluated by the same standard applicable to motions to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir.2010). These motions must be made

after the close of the pleadings, "but early enough not to delay trial...." *Id.*

■ "'In considering a motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6), a district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference.'" *Newman & Schwartz v. Asplundh Tree Expert Co.,* 102 F.3d 660, 662 (2d Cir.1996) (quoting *Kramer v. Time Warner, Inc.,* 937 F.2d 767, 773 (2d Cir.1991)). A court should consider the motion "accepting all factual allegations in the complaint and drawing all reasonable inferences in the plaintiff's favor." *Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (internal quotations and citation omitted). To withstand dismissal, a plaintiff must set forth "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Turkmen v. Ashcroft,* 589 F.3d 542, 546 (2d Cir.2009) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)).

"[A] plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955 (alteration in original) (internal quotations and citations omitted). Thus, "at a bare minimum, the operative standard requires the plaintiff [to] provide the grounds upon which his claim rests through factual allegations sufficient to raise a right to relief above the speculative level." *Goldstein v. Pataki,* 516 F.3d 50, 56 (2d Cir.2008) (al-

teration in original) (internal quotations and citations omitted).

■ "A complaint is deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint." *Sira v. Morton,* 380 F.3d 57, 67 (2d Cir.2004) (citations omitted).

■ In addition, "[i]t is well-settled that *pro se* litigants generally are entitled to a liberal construction of their pleadings, which should be read to raise the strongest arguments that they suggest." *Green v. United States,* 260 F.3d 78, 83 (2d Cir. 2001) (internal quotations and citation omitted); *see also Hemphill v. New York,* 380 F.3d 680, 687 (2d Cir.2004) (alteration in original) (internal citation omitted) ("It is well-established that 'when [a] plaintiff proceeds *pro se* ... a court is obliged to construe his pleadings liberally, particularly when they allege civil rights violations.'"). Moreover, "a *pro se* litigant should be afforded every reasonable opportunity to demonstrate that he has a valid claim." *Satchell v. Dilworth,* 745 F.2d 781, 785 (2d Cir.1984). "Even in a *pro se* case, however, 'although a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" *Chavis v. Chappius,* 618 F.3d 162, 170 (2d Cir.2010) (quoting *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009)). A court may not "invent factual allegations [plaintiff] has not pled." *Id.*

## I. Plaintiff's Motion for Recusal

In a letter dated January 1, 2015, and filed January 13, 2015, Plaintiff asks that the undersigned recuse herself from this matter pursuant to 28 U.S.C. § 455(a).

(Dkt. 142). Plaintiff alleges in a conclusory fashion that the undersigned has racial and prejudicial biases due to her recent unfavorable decision following a bench trial in a separate matter, designated by case number 01–CV–6559, and that therefore recusal is appropriate. (*Id.*). Defendants have filed papers in response to the motion (Dkt. 144 at 2; Dkt. 145), and Plaintiff has filed reply papers (Dkt. 147). The recusal issue is a threshold issue that must be resolved before the Court may consider any substantive motion.

 "Title 28 U.S.C. § 455(a) requires a judge to recuse [her]self 'in any proceeding in which [her] impartiality might reasonably be questioned.'" *Cox v. Onondaga Cnty. Sheriff's Dep't*, 760 F.3d 139, 150 (2d Cir.2014) (quoting 28 U.S.C. § 455(a)). "Recusal motions 'are committed to the sound discretion of the district court....'" *Abidekun v. N.Y.C. Transit Auth.*, No. 93–CV–5600 (FB), 1998 WL 296372, at *1 (E.D.N.Y. June 4, 1998) (quoting *United States v. Conte*, 99 F.3d 60, 65 (2d Cir.1996)). "In cases where a judge's impartiality might reasonably be questioned, the issue for consideration is not whether the judge is in fact subjectively impartial, but whether the objective facts suggest impartiality." *Williams v. LaClair*, No. 9:10–CV–635(GLS/RFT), 2013 WL 1193766, at *3 (N.D.N.Y. Jan. 29, 2013) (citing *Liteky v. United States*, 510 U.S. 540, 548, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994)).

 Here, the fact that the Court reached an unfavorable decision in another, unrelated matter provides no basis for recusal. *Mills v. Poole*, Nos. 1:06–cv–00842–MAT–VEB, 1:11–cv–00440–MAT, 2014 WL 4829437, at *6 (W.D.N.Y. Sept. 29, 2014) ("[Plaintiff's] claims of bias and impartiality on the part of the undersigned . . . are both conclusory and based entirely on his disagreement with the Court's decisions. This is an insufficient basis for recusal."). Put simply, there is no evidence justifying recusal nor is there any basis for recusal. Accordingly Plaintiff's motion for recusal is denied.

## II. County Defendants' Motion for Judgment on the Pleadings

### A. Municipal Liability

Plaintiff sues the County of Monroe in its "official capacity as a municipal entity" (Dkt. 95 at ¶ 5), alleging that the County: (1) failed to "properly train or supervise Defendants Brooks and O'Flynn" (*id.* at ¶¶ 48, 57, 61, 89, 97); (2) maintained a discriminatory custom, policy, or practice of classifying inmates by race and placing those racial minorities in unsafe or unsanitary conditions (*id.* at ¶¶ 48, 60, 71, 73); and (3) maintained an unconstitutional grievance program (*id.* at ¶¶ 91, 95–97).

Defendants argue that Monroe County has not assumed liability for the acts of the County Sheriff or his deputies by local law, and therefore Monroe County cannot be liable to the extent Plaintiff alleges claims under New York State law. (Dkt. 119–2 at 4–5). Defendants also argue that Monroe County and Defendant Brooks cannot be held liable for Plaintiff's § 1983 claims because he has failed to plausibly allege that the County is responsible for developing or implementing the policies, procedures, and regulations related to the conduct of the Sheriff deputies named as Defendants. (Dkt. 119–2 at 5).

#### 1. State Law Causes of Action

 Plaintiff claims on numerous occasions that Monroe County "failed to properly train or supervise" Defendants Brooks and/or O'Flynn. (*See e.g.* Dkt. 95 at ¶¶ 48, 57, 61, 89). To the extent Plaintiff is attempting to assert claims under New York State law, his claims fail. Monroe County has not assumed liability for the acts of the Sheriff or his deputies by local law, and

therefore the County cannot be held liable to the extent Plaintiff is alleging a state law claim based upon a *respondeat superior* theory. *See D'Amico v. Corr. Med. Care, Inc.*, 120 A.D.3d 956, 959, 991 N.Y.S.2d 687 (4th Dep't 2014); *Smelts v. Meloni*, 306 A.D.2d 872, 873, 762 N.Y.S.2d 467 (4th Dep't 2003), *lv. denied* 100 N.Y.2d 516, 769 N.Y.S.2d 203, 801 N.E.2d 424 (2003). Furthermore, as discussed further below, Plaintiff fails to state any plausible claim as to Defendant Brooks' or O'Flynn's personal involvement and liability, thus negating any corresponding responsibility on the part of the County for their conduct.

### 2. Section 1983 Claims

"[A] municipality can be held liable under Section 1983 if the deprivation of the plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality." *Jones v. Town of East Haven*, 691 F.3d 72, 80 (2d Cir.2012), *cert. denied*, —— U.S. ——, 134 S.Ct. 125, 187 L.Ed.2d 255 (2013). That is, "to assert a claim of municipal liability under § 1983, a plaintiff must allege the existence of a policy or custom that caused injury, and a direct causal connection between that policy or custom and the deprivation of a constitutional right." *Blyden v. N.Y.P.D.*, No. 05 CV 4740 SJF LB, 2005 WL 3388609, at *2 (E.D.N.Y. Dec. 12, 2005). "Absent such a custom, policy, or usage, a municipality cannot be held liable on a *respondeat superior* basis for the tort of its employee." *Jones*, 691 F.3d at 80.

"To prevail on a Section 1983 claim against a municipal entity, a plaintiff must show: '(1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury.'" *Reid v. Nassau Cnty. Sheriff's Dep't*, No. 13–CV–1192 (SJF)(SIL), 2014 WL 4185195, at *10 (E.D.N.Y. Aug. 20,

2014) (quoting *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir.2008)). "A municipal policy may be pronounced or tacit and reflected in either action or inaction." *Cash v. Cnty. of Erie*, 654 F.3d 324, 333 (2d Cir.2011). "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 131 S.Ct. 1350, 1359, 179 L.Ed.2d 417 (2011).

Plaintiff has, in a conclusory fashion, alleged that Monroe County has a discriminatory policy of housing minorities together at MCJ, which leads to "rampant" gang activity. (Dkt. 95 at ¶¶ 25–26, 48, 57, 61, 72–73, 94–96). However, Plaintiff fails to allege with any factual specifics the existence of a sanctioned County policy that states that minority inmates should be placed in certain housing. Plaintiff would be required to allege that the practices were "so persistent and widespread as to practically have the force of law." *Connick*, 131 S.Ct. at 1359. This Plaintiff has failed to do.

"The mere assertion ... that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference." *Dwares v. City of New York*, 985 F.2d 94, 100 (2d Cir.1993), *overruled on other grounds, Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993). Here, Plaintiff offers no allegations of fact tending to support even an inference of an official policy. "Where a plaintiff can show only misbehaving officers, but has not [alleged] an official policy that led to the constitutional or statutory violation, his claim must fail." *Adilovic v. Cnty. of Westchester*, No. 08 Civ.

10971(PGG), 2011 WL 2893101, at *8 (S.D.N.Y. July 14, 2011) (quotations omitted).

Plaintiff also includes numerous general allegations in his complaint that the MCJ maintains an unconstitutional grievance program. (Dkt. 95 at ¶¶ 91, 94–98).

■ "[T]he law is clear that plaintiff has no constitutional right to have his grievances processed at all, or if processed, to have the procedure done properly." *Hill v. Napoli,* No. 6:09–CV–6546–MAT, 2014 WL 1322476, at *14 (W.D.N.Y. Mar. 31, 2014) (internal quotation and citation omitted); *see also Green v. Herbert,* 677 F.Supp.2d 633, 639 (W.D.N.Y.2010) (inmate's claims that officer assigned to investigate his grievance conducted a biased, unfair investigation "fails because an inmate has no constitutional right to have his grievances processed or investigated in any particular manner.") (internal quotations and citation omitted).

■ Plaintiff contends that Monroe County maintains a grievance program that is biased and prejudicial. (Dkt. 95 at ¶¶ 91, 95–97). "Claims of hearing officer bias are common in § 1983 cases by inmate plaintiffs, and where they are based on purely conclusory allegations, they are routinely dismissed." *Washington v. Afify,* 968 F.Supp.2d 532, 541–42 (W.D.N.Y. 2013). "An inmate's own subjective belief that the hearing officer was biased is insufficient to create a genuine issue of material fact." *Booker v. Maly,* No. 9:12–CV–246 NAM/ATB, 2014 WL 1289579, at *11 (N.D.N.Y. Mar. 31, 2014). Plaintiff has failed to articulate any facts to support his otherwise conclusory statements that Defendant hearing officers showed any bias or prejudice toward Plaintiff or any other minority inmate. Plaintiff has also failed to plead that there is any official policy or custom supporting a biased or prejudicial grievance program.

In sum, Plaintiff's allegations against the County under § 1983 must be dismissed because he has failed to allege a plausible claim that the County had a custom, policy, or usage that led to the deprivation of Plaintiff's constitutional rights. Plaintiff's claims are conclusory in nature, and are therefore insufficient to withstand scrutiny under Fed.R.Civ.P. 12(c).

## B. Sheriff O'Flynn Liability

Plaintiff sues Monroe County Sheriff Patrick O'Flynn in his individual capacity, alleging that Defendant O'Flynn engaged in "gross negligent management" of various officers at MCJ and supported the "unconscionable tyranny" of placing all minorities in SHU. (Dkt. 1 at ¶¶ 7, 48, 57, 61, 63, 72–73, 78, 94–96). Further, Plaintiff claims that Defendant O'Flynn received numerous complaints and appeals from Plaintiff concerning the alleged racial discrimination and unlawful conduct, and that Defendant O'Flynn "acquiesced in the application of this discrimination against the Plaintiff." (Dkt. 1 at ¶¶ 24, 63, 78). Defendants argue that Plaintiff's claims against Defendant O'Flynn fail because Plaintiff has not established personal involvement on behalf of the Sheriff. (Dkt. 119–2 at 6–7). The Court agrees.

### 1. New York State Claims

■ It is well settled that "the Sheriff cannot be held personally liable on the basis of respondeat superior for the alleged negligent acts of his deputies." *Schulik v. Cnty. of Monroe,* 202 A.D.2d 960, 961, 609 N.Y.S.2d 502 (4th Dep't 1994). As a result, Defendant O'Flynn may not be found liable under a *respondeat superior* theory for any alleged negligent acts performed by the County Defendants.

To the extent that Plaintiff alleges that Defendant O'Flynn is responsible for the

actions of his deputies under New York law, these claims are dismissed.

## 2. Section 1983 Claims

 "[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir.1994) (citations omitted). As explained by the Second Circuit Court of Appeals:

> [w]ithin the Second Circuit, it is generally accepted that a supervisory defendant may have been personally involved in a constitutional deprivation within the meaning of § 1983 if he: (1) directly participated in the alleged infraction; (2) after learning of the violation, failed to remedy the wrong; (3) created a policy or custom under which unconstitutional practices occurred or allowed such policy or custom to continue; (4) was grossly negligent in managing subordinates who caused the unlawful condition or event; or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir.1995). "Mere linkage in the prison chain of command is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim." *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir.2003) (quotation omitted).

Here, Plaintiff argues that Defendant O'Flynn was personally involved in the alleged constitutional deprivations because he "is the chief policy maker for MCJ which created conditions which unconstitutional ratifications occurred." (Dkt. 133–3 at 16). However, Plaintiff has failed to allege, beyond conclusory allegations, that there was a policy that created unconstitutional conditions at MCJ.

 Further, although Plaintiff alleges that he sent Defendant O'Flynn numerous notices of his concerns about alleged constitutional deprivations, "the receipt of letters or grievances, by itself, does not amount to personal involvement." *Mateo v. Fischer*, 682 F.Supp.2d 423, 430 (S.D.N.Y.2010) (citing *Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir.1997)). *See also Ramsey v. Goord*, No. 05–CV–47A, 2005 WL 2000144, at *8, 2005 U.S. Dist. LEXIS 42953, at *8 (W.D.N.Y.2005) ("the fact that a prison official in the prison 'chain of command' affirms the denial of an inmate's grievance is not enough to establish the requisite personal involvement of that official"). Plaintiff has not alleged that Defendant O'Flynn responded to any of his grievances or appeals, and his conclusory allegations that Defendant O'Flynn "acquiesced" in his poor treatment on the basis of this failure to respond does not state a claim against a supervisory defendant.

 In addition, Plaintiff claims that Defendant O'Flynn engaged in "gross negligent management" of various officers. (Dkt. 95 at ¶¶ 48, 57, 61, 94–96). For example, Plaintiff alleges that Defendant O'Flynn negligently managed Defendants Lipari and Harling, who allegedly filed a "fraudulent response" to Plaintiff's grievances. (*Id.* at ¶ 94). These allegations of negligent management on the part of Defendant O'Flynn lack any factual support. Moreover, as discussed in further detail later in this discussion, Plaintiff has failed to sufficiently allege that his rights were violated by the filing of a fraudulent response. Indeed, each of Plaintiff's allegations of negligent management is attached to an alleged violation that he has failed to sufficiently allege. Absent an underlying constitutional violation, there can be no supervisory liability, or negligent management. *See Murray v. Pataki*, No. 9:03–CV–1263 (LEK/RFT), 2007 WL 956941, at *7 (N.D.N.Y. Mar. 29, 2007) ("Plaintiff has failed to establish that Goord was grossly

negligent in his supervision of unknown subordinates, especially since no constitutional violation arose from this incident. . . .").

As a result, Plaintiff's claims against Defendant O'Flynn are dismissed.

## C. Defendant Brooks

██ Plaintiff sues Monroe County Executive. Maggie Brooks in her individual capacity, alleging that Defendant Brooks engaged in "gross negligent management" of various officers at MCJ and supported the "unconscionable tyranny" of placing all minorities in SHU. (Dkt. 1 at ¶¶ 6, 25–26, 48, 57, 61, 72–73, 94–96). For the same reasons that Plaintiff has failed to state a claim against Defendant O'Flynn, he has failed to state a claim against Defendant Brooks. Defendant Brooks' position as chief executive of Monroe County does not suffice to state a claim against her. Plaintiff fails to offer any factual support for his conclusory allegations against Defendant Brooks, and he has not sufficiently alleged that constitutional violations occurred for any of the underlying events that he alleges Defendant Brooks negligently managed. Accordingly, Plaintiff's claims against Defendant Brooks are dismissed.

## D. Jail Supervisors and Administrators

Defendants argue that the claims against the MCJ supervisors and administrators must be dismissed because § 1983 liability may not be imposed merely because an individual holds a supervisory position of authority. (Dkt. 119–2 at 7–8 (citing *Colon*, 58 F.3d at 873)). Although this is an accurate statement of the law, Defendants fail to demonstrate which claims against which Defendants fail to demonstrate personal involvement. Rather, Defendants generally argue that "the actions against all Jail Supervisors and Administrators should be dismissed for lack of personal involvement." (Dkt. 119–

2 at 8). To the extent that any supervisory Defendants are dismissed from this action based on lack of personal involvement, these Defendants are dismissed in the more detailed discussion below. However, the Court disagrees with Defendants that, as a matter of law, all "jail supervisors and administrators" must be dismissed. Rather, as discussed further below, Plaintiff has sufficiently alleged personal involvement by some of these Defendants.

## E. Prisoner Litigation Reform Act ("PLRA")

██ Defendants contend that Plaintiff's claims are barred by the Prisoner Litigation Reform Act ("PLRA"). (Dkt. 119–2 at 12–13). Specifically, Defendants argue that Plaintiff has failed to exhaust his administrative remedies or show that he was injured with respect to the matters at issue in this litigation. (*Id.* at 12). Plaintiff argues that the PLRA does not apply to him as he was a pretrial detainee at the time of the alleged violations. (Dkt. 133–3 at 24). Plaintiff's argument is without merit, because "the PLRA's strict exhaustion requirement does indeed apply in actions brought by pretrial detainees." *Baez v. Parks,* No. 02 CIV.5821 PKC DF, 2004 WL 1052779, at *5 (S.D.N.Y. May 11, 2004) (collecting cases); *see also Little v. Mun. Corp.,* 51 F.Supp.3d 473, 502–03, No. 12–CV–5851 (KMK), 2014 WL 5011091, at *19 (S.D.N.Y. Sept. 30, 2014) (applying PLRA exhaustion requirements to pretrial detainees); *Franklin v. Canty,* No. 13 CV 3873(VB), 2014 WL 2217003, at *2 (S.D.N.Y. May 27, 2014) (same).

██ The PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhaust-

ed." 42 U.S.C. § 1997e(a). "This administrative exhaustion provision requirement 'applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.'" *Torres v. Carry*, 672 F.Supp.2d 338, 342–43 (S.D.N.Y.2009) (quoting *Porter v. Nussle*, 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002)). "This provision affords 'prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being ha[u]led into court[,]' and also creates an administrative record that facilitates judicial review." *Torres v. Anderson*, 674 F.Supp.2d 394, 397 (E.D.N.Y.2009) (quoting *Jones v. Bock*, 549 U.S. 199, 204, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007)).

██ However, "[t]he only circumstance in which it is appropriate to dismiss a complaint on nonexhaustion grounds is when it is apparent from the face of the complaint that the plaintiff failed to exhaust his administrative remedies." *Randle v. Alexander*, 960 F.Supp.2d 457, 483 (S.D.N.Y.2013); *see also Parris v. N.Y.S. Dep't Corr. Servs.*, 947 F.Supp.2d 354, 361 (S.D.N.Y.2013) (denying motion to dismiss on grounds of exhaustion where it was not evident from the face of the complaint that plaintiff had or had not complied with the inmate grievance program); *Johnson v. Westchester Cnty. Dep't of Corr. Med. Dep't*, No. 10 Civ. 6309, 2011 WL 2946168, at *2 (S.D.N.Y. July 19, 2011) (denying a motion to dismiss when the complaint was ambiguous about exhaustion). "Most circuits that have considered the issue, ... including this circuit, have held that nonexhaustion is an affirmative defense, and that therefore defendants bear the burden of proof and prisoner plaintiffs need not plead exhaustion with particularity." *McCoy v. Goord*, 255 F.Supp.2d 233, 248 (S.D.N.Y.2003).

██ Defendants have not met their burden to demonstrate that Plaintiff failed to exhaust his administrative remedies. Defendants argue that the documents attached to Plaintiff's complaint do not show that a final determination was made by the Citizen Policy and Complaint Review Council, and therefore Plaintiff has not exhausted his administrative remedies. (Dkt. 119–2 at 12). However, it is Defendants' burden to demonstrate nonexhaustion, not Plaintiff's burden to plead exhaustion with particularity. It is not apparent from the face of Plaintiff's complaint that he has failed to exhaust his administrative remedies. Although Plaintiff makes some allegations that he filed grievances and appeals as to his underlying concerns, he does not discuss his pursuit of administrative remedies as to each and every claim. As a result, it would be inappropriate at this stage in the litigation to dismiss Plaintiff's claims for failure to exhaust his administrative remedies under the PLRA.

### F. *Res Judicata*/Collateral Estoppel

Plaintiff has brought previous litigation concerning issues that overlap with the allegations he makes in his current complaint. In *Barnes v. Monroe County Sheriff*, 89 A.D.3d 1471, 933 N.Y.S.2d 630 (4th Dep't 2011), the court reviewed Plaintiff's Article 78 proceeding seeking review of the administrative hearings on November 27, 2009, and March 9, 2009, which resulted in Plaintiff's placement in SHU. The Fourth Department dismissed Plaintiff's petition. *Id.* In *Barnes v. Harling*, 96 A.D.3d 1415, 945 N.Y.S.2d 901 (4th Dep't 2012), *lv. denied*, 19 N.Y.3d 1011, 951 N.Y.S.2d 706, 976 N.E.2d 233 (2012), Plaintiff brought an Article 78 proceeding seeking review of his placement in SHU as a result of his hearings on March 11, 2009, March 25, 2009, April 16, 2009, and disciplinary orders from March 28, 2009, April 3, 2009, April 27, 2009, and May 21, 2009.

The Fourth Department found that Plaintiff was "not entitled to any of the relief he seeks," and the Court of Appeals denied Plaintiff's motion to appeal this determination. *Id.*

■■■■ Defendants request that this Court take judicial notice of the determinations made in these state court matters and find that Plaintiff is precluded from relitigating those issues under the doctrines of *res judicata* and collateral estoppel. " 'A court may take judicial notice of matters of public record, including . . . decisions in prior state court.' " *Pacherille v. Burns,* 30 F.Supp.3d 159, 161 (N.D.N.Y. 2014) (quoting *Johnson v. Pugh,* No. 11–CV–385, 2013 WL 3013661, at *2 (E.D.N.Y. June 18, 2013)). The Court takes judicial notice of these decisions from the Fourth Department. *See Stewart v. Transp. Workers Union of Greater N.Y., Local 100,* 561 F.Supp.2d 429, 435–36 (S.D.N.Y.2008) (stating that a district court may take judicial notice of matters of public record in resolving a Rule 12(c) motion). "In the context of a Rule 12(c) motion, however, the Court should generally take judicial notice 'to determine what statements [the documents] contain[ ] . . . not for the truth of the matters asserted.' " *Piazza v. Fla. Union Free Sch. Dist.,* 777 F.Supp.2d 669, 678 (S.D.N.Y.2011) (quoting *Kramer v. Time Warner Inc.,* 937 F.2d 767, 774 (2d Cir.1991)) (alterations in original).

■■■■ Here, claim preclusion, or *res judicata,* does not bar Plaintiff's civil rights lawsuit based upon his prior Article 78 proceedings. "As the Second Circuit explained . . . claim preclusion, known as res judicata, requires that a final judgment on the merits of an action be given preclusive effect, barring parties as well as those in privity with them from relitigating in a subsequent action a claim which was or could have been raised in the prior suit." *Johnson v. McClure,* No. 9:06–CV–0431,

2009 WL 2356147, at *7 (N.D.N.Y. July 28, 2009) (citing *Marvel Characters, Inc. v. Simon,* 310 F.3d 280, 286–87 (2d Cir. 2002)). In this case, Plaintiff's civil rights claims could not have been raised in the Article 78 proceedings. "[A] New York plaintiff is not barred from seeking damages, in federal court, on civil rights claims by reason of a prior judgment on the same underlying facts in an Article 78 proceeding and therefore that action cannot give the damages relief demanded in a civil rights suit such as this one." *Davis v. Halpern,* 813 F.2d 37, 39 (2d Cir.1987); *see also Leo v. N.Y.C. Dep't of Educ.,* No. 13 CV 2271(RJD)(JMA), 2014 WL 6460704, at *4 (E.D.N.Y. Nov. 17, 2014) (*res judicata* doctrine did not apply to plaintiff's § 1983 claims because plaintiff could not have received damages for violations of his civil rights in his prior Article 78 proceeding).

■■■■ However, a portion of Plaintiff's claims are barred under the doctrine of issue preclusion, also known as collateral estoppel. "[U]nder New York law, the doctrine of collateral estoppel 'precludes a party from relitigating in a subsequent action or proceeding an issue clearly raised in a prior action or proceeding and decided against that party or those in privity, whether or not the tribunals or causes of action are the same.' " *Shell v. Brun,* 362 F.Supp.2d 398, 400 (W.D.N.Y.2005) (quoting *Ryan v. N.Y. Tel. Co.,* 62 N.Y.2d 494, 500, 478 N.Y.S.2d 823, 467 N.E.2d 487 (1984)). "It is well-settled that collateral estoppel may bar a plaintiff from bringing an action in federal court pursuant to 42 U.S.C. § 1983." *Id.; see also Vann v. Fischer,* No. 11 Civ.1958(KPF), 2014 WL 4188077, at *25 (S.D.N.Y. Aug. 25, 2014) (plaintiff barred in § 1983 action from relitigating issues concerning bias and due process violations during prison disciplinary proceeding that were previously raised during Article 78 proceeding).

There are two requirements for the application of collateral estoppel to an issue: "(1) the issue in question was actually and necessarily decided in a prior proceeding, and (2) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the first proceeding." *McKithen v. Brown*, 481 F.3d 89, 105 (2d Cir.2007), *cert. denied* 552 U.S. 1179, 128 S.Ct. 1218, 170 L.Ed.2d 59 (2008) (quotation omitted).

"To determine whether the first action provided a full and fair opportunity to litigate requires consideration of: the nature of the forum and the importance of the claim in the prior litigation, the incentive and initiative to litigate and the actual extent of litigation, the competence and expertise of counsel, the availability of new evidence, the differences in the applicable law and the foreseeability of future litigation." *Shell v. Brun*, 362 F.Supp.2d 398, 400 (W.D.N.Y.2005).

Here, the state court has already examined Plaintiff's challenges to his November 27, 2009, March 9, 2009, March 11, 2009, March 25, 2009, and April 16, 2009 hearings, and his disciplinary orders from March 28, 2009, April 3, 2009, April 27, 2009, and May 21, 2009, which resulted in Plaintiff's placement in SHU. It appears that Plaintiff was given a full opportunity to litigate these issues in his Article 78 proceedings. As a result, Plaintiff's claims related to these hearings and assignments to SHU must be dismissed as barred by the doctrine of collateral estoppel.

### G. Excessive Use of Force

Plaintiff asserts § 1983 claims of excessive use of force based upon alleged incidents on August 7, 2008, and August 12, 2009. "To state a § 1983 claim, a plaintiff must allege that defendant, while acting 'under color of state law,' deprived Plaintiff of his constitutional or statutory rights." *Cunningham v. Rodriguez*, No.

01 Civ. 1123(DC), 2002 WL 31654960, at *4 (S.D.N.Y. Nov. 22, 2002) (quoting 42 U.S.C. § 1983). "A pretrial detainee who is subjected to excessive force may bring a claim under § 1983." *Id.*

"Because the Eighth Amendment's protection from cruel and unusual punishment does not apply until after conviction and sentence, the right of pretrial detainees to be free from excessive force amounting to punishment is protected by the Due Process Clause of the Fourteenth Amendment." *Adilovic*, 2011 WL 2893101, at *4 (quotations omitted). "The Second Circuit applies the same standard to excessive force claims brought under the Fourteenth Amendment as under the Eighth Amendment." *Virella v. Pozzi*, No. 05 Civ. 10460(RWS), 2006 WL 2707394, at *3 (S.D.N.Y. Sept. 20, 2006) (citing *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir.1999)).

"[T]he analysis provided by the Supreme Court in *Hudson v. McMillian*, 503 U.S. 1, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992), that requires a sentenced prisoner to satisfy both an objective and subjective prong to establish an Eighth Amendment violation also applies to excessive force claims brought by a pretrial detainee." *Perkins v. Brown*, 285 F.Supp.2d 279, 283 (E.D.N.Y.2003).

"The objective component of a claim of cruel and unusual punishment focuses on the harm done, in light of 'contemporary standards of decency.'" *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir.2009) (quoting *Hudson*, 503 U.S. at 8, 112 S.Ct. 995). "Nonetheless, the Eighth Amendment's prohibition against cruel and unusual punishment does not extend to 'de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind.'" *Id.* at 269 (quoting *Hudson*, 503 U.S. at 8,

112 S.Ct. 995). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Johnson v. Glick,* 481 F.2d 1028, 1034 (2d Cir.1973).

 "The subjective requirement is satisfied if the defendant acted wantonly with a sufficiently culpable state of mind." *Perkins,* 285 F.Supp.2d at 283. "Where a state official is accused of using excessive physical force against a pretrial detainee, the inquiry turns on 'whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Id.* (quoting *United States v. Walsh,* 194 F.3d 37, 48–49 (2d Cir.1999)).

### 1. August 7, 2008

 Plaintiff alleges that Defendant Newton used excessive force on Plaintiff on August 7, 2008, when he responded to the fight between Plaintiff and inmates Eades and Members, and jumped on Plaintiff's back, striking Plaintiff in the face and knocking out a tooth. (Dkt. 95 at ¶ 20). Defendants argue that Plaintiff fails to sufficiently allege that Defendants had a culpable state of mind insofar as "any alleged force used by defendant was made in a good faith effort by defendants to maintain or restore discipline." (Dkt. 119–2 at 15). Defendants claim that the force was used because Plaintiff was fighting with other inmates and resisted the placement of handcuffs. (*Id.*).

Objectively, Plaintiff has sufficiently alleged that Defendant Newton used force above a *de minimis* level. Plaintiff claims that Defendant Newton jumped on his back and knocked out a tooth. At this early stage in the litigation, this force and subsequent injury satisfies the first prong of an excessive use of force claim. *See Tafari v. McCarthy,* 714 F.Supp.2d 317, 362 (N.D.N.Y.2010) (finding incident where officer pulled plaintiff's face into steel door, breaking his tooth, may support excessive use of force claim).

Subjectively, Plaintiff has sufficiently alleged that Defendant Newton was not merely using force to maintain or restore discipline. Taking Plaintiff's claims as true, Defendant Newton "premeditated" the whole incident and intended for Plaintiff to be attacked by two other inmates.

As a result, Plaintiff's claim of excessive use of force as against Defendant Newton relating to the August 7, 2008, incident may proceed to discovery.

### 2. August 12, 2009

 Plaintiff claims that Defendants Daly, Shellard, Alberti, Galen, and Lipari used excessive force on Plaintiff on August 12, 2009. (Dkt. 95 at ¶¶ 33–39). Specifically, Plaintiff alleges that Defendant Shellard pushed Plaintiff face-first into a glass window; Defendants Shellard, Daly, and Alberti pushed Plaintiff to the floor, kicked, stomped on, and punched Plaintiff; Defendants Alberti and Daly used Plaintiff's handcuffs to inflict pain; and that Defendants Alberti and Daly "slammed Plaintiff's head." (Dkt. 95 at ¶¶ 35–39). Defendants Galen, Daly, and Alberti allegedly "dragged" Plaintiff back to his cell. (*Id.* at ¶ 39). According to Plaintiff, as a result of this altercation, he urinated and defecated on himself, and experienced dizziness and a concussion. (*Id.*). Defendants argue that Plaintiff has failed to state a claim because he fails to allege "how he was harmed on that date and/or that the force taken was unwarranted." (Dkt. 119–2 at 16).

Objectively, Plaintiff has sufficiently alleged an excessive use of force. Taking Plaintiff's allegations as true, Plaintiff was reaching for his legal papers when Defendant Shellard pushed him into a glass window and then took him to the floor, where Defendants Shellard, Daly, and Alberti proceeded to kick, stomp on, and punch

Plaintiff. (Dkt. 95 at ¶¶ 35–37). When Plaintiff attempted to steady himself by grabbing a gate, Defendants Alberti and Daly "slammed" Plaintiff's head, causing Plaintiff to urinate and defecate on himself, and experience dizziness and a concussion. (*Id.* at ¶¶ 38–39). Plaintiff alleges Defendants Galen, Daly, and Alberti dragged him back to his cell. (*Id.* at ¶ 39). Contrary to Defendants' assertions, Plaintiff has sufficiently alleged how he was harmed by Defendants' actions on August 12, 2009.

Plaintiff has also sufficiently alleged the subjective component of his claim. Plaintiff alleges that the force used on him was in response to his reaching for legal papers and attempting to steady himself. Taken as true, the force could not have been used in a good faith effort to maintain or restore discipline, as Plaintiff had not violated any directives.

Accordingly, Plaintiff's August 12, 2009, excessive use of force claim as against Defendants Shellard, Daly, Galen, and Alberti may proceed to discovery. To the extent this claim is asserted against Defendant Lipari, it is discussed below under the failure to protect analysis.

## H. Conspiracy

To state a conspiracy claim in violation of constitutional rights under § 1983, a plaintiff must allege: "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999). The intracorporate conspiracy doctrine provides that "if the conspiratorial conduct challenged is essentially a single act by a single corporation acting exclusively through its own ... officers[ ] and employees, each acting within the scope of his

employment[,] there can be no actionable conspiracy." *O'Diah v. Neth,* No. 6:10–CV–6592(MAT), 2013 WL 6440610, at *4 (W.D.N.Y. Dec. 9, 2013) (internal quotation and citation omitted) (alterations in original). "[A]n exception to the doctrine applies when individual employees are pursuing personal interests wholly separate and apart from the entity...." *Anemone v. Metro. Transp. Auth.,* 419 F.Supp.2d 602, 604 (S.D.N.Y.2006).

"While exact specifics are not required, 'the pleadings must present facts tending to show agreement and concerted action.'" *Graham v. Peters,* No. 13–CV–705JTC, 2013 WL 5924727, at *2 (W.D.N.Y. Oct. 31, 2013) (quoting *Anilao v. Spota,* 774 F.Supp.2d 457, 512–13 (E.D.N.Y.2011)). Plaintiff is required to "make an effort to provide some details of time and place and the alleged effects of the conspiracy ... [including] facts to demonstrate that the defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Warren v. Fischl,* 33 F.Supp.2d 171, 177 (E.D.N.Y. 1999) (citations omitted). "Bare allegations of a conspiracy supported only by allegations of conduct easily explained as individual action are insufficient." *Booker,* 2014 WL 1289579, at *25.

### 1. August 7, 2008

Plaintiff claims that Defendants Amico and Danehy "collaborated" with Defendant Newton to permit the attack on Plaintiff by inmates Eades and Members on August 6, 2008. (Dkt. 95 at ¶¶ 30–32). Defendants contend that Plaintiff has only vaguely asserted conclusory statements of conspiracy, and therefore his conspiracy claim must be dismissed. (Dkt. 119–2 at 15).

After carefully reviewing Plaintiff's complaint and drawing all reasonable inferences in his favor, the Court concludes

that while the facts are inartfully drafted, Plaintiff has plausibly alleged that Defendants Amico or Danehy "collaborated" with Defendant Newton in his premeditated plan to permit an inmate attack on Plaintiff. Plaintiff has alleged that Defendants engaged in an "overt act" in furtherance of the conspiracy through the delay in calling a "Code # 1." Accordingly, giving Plaintiff the benefit of the doubt, his conspiracy claim as to Defendants Amico, Danehy, and Newton may proceed to discovery.

## 2. February 26, 2009

Plaintiff claims that Defendants Waud, T. Peck, Mooney, Dimartino, Robertson, and Fitzsimmons "collaborated reports" to delete any references to the theft of Plaintiff's commissary. (Dkt. 95 at ¶ 47). Plaintiff contends that Defendants Krenzer, Harling, Jolly, Dimartino, Mooney, T. Peck, Waud, Fitzsimmons, and Robinson altered the videotape evidence of the commissary theft by deleting the time period from 8:55 p.m. through 9:30 p.m. from the tape. (*Id.* at ¶ 101). Plaintiff suggests that Defendants Harling, Krenzer, Thomas, and Jolly encouraged the falsification of the records. (*Id.* at ¶ 48).

Plaintiff's claims are conclusory in nature. "Complaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct." *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 325 (2d Cir.2002). "While exact specifics are not required, 'the pleadings must present facts tending to show agreement and concerted action.'" *Barnes v. Prack*, No. 11–CV–857 (TJM/CFH), 2012 WL 7761905, at *9 (N.D.N.Y. Sept. 7, 2012) (quoting *Anilao*, 774 F.Supp.2d at 512–13). *See, e.g., Johnson v. Barney*, No. 04 Civ. 10204, 2006 WL

3714442, at *2 (S.D.N.Y. Dec. 13, 2006) (dismissing for failure to state a claim prisoner's conclusory allegation that defendant fabricated an investigative report as part of a conspiracy to cover up the wrongful acts of other correction officers), *aff'd*, 360 Fed.Appx. 199 (2d Cir.2010); *Barnes*, 2012 WL 7761905, at *10 (dismissing claim of conspiracy to manipulate videotape evidence where plaintiff "fail[ed] to provide any plausible information which would lend credence to his claims of an explicit or implicit agreement between any or all of [the] defendants").

 Further, Plaintiff's claims do not allege a constitutional injury as required for a conspiracy claim. "In order to bring a valid § 1983 claim, a plaintiff must establish that [he] was deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law." *Graham v. City of Albany*, No. 1:08–CV–892 (RFT), 2009 WL 4263510, at *9 (N.D.N.Y. Nov. 23, 2009) (quotations omitted). Even if Defendants had conspired to cover up the theft of Plaintiff's personal property, Plaintiff has not alleged a constitutional injury. As the District Court stated in *Collins v. Goord*, 438 F.Supp.2d 399 (S.D.N.Y.2006):

> Even an intentional deprivation of an inmate's property that is random and unauthorized does not give rise to a due process claim so long as adequate state post-deprivation remedies are available. New York law provides such a remedy in the form of an action before the New York Court of Claims.

*Id.* at 418–19 (dismissing inmate Plaintiff's theft of personal property claim) (internal quotations and citations omitted). In other words, because Plaintiff had state remedies available to him for the alleged deprivation, there can be no underlying constitutional injury. "Absent an

underlying constitutional injury, a civil rights conspiracy claim cannot survive." *Johnson v. Rock,* No. 9:08–CV–1013 (GLS/RFT), 2010 WL 3911389, at *7 (N.D.N.Y. Mar. 30, 2010), *adopted by Johnson v. Rock,* 2010 WL 3910153 (N.D.N.Y. Sept. 30, 2010).

Therefore, Plaintiff's claims of conspiracy related to the February 26, 2009 incident are dismissed.

## I. Failure to Protect

■ "As opposed to deliberate indifference claims brought by post-conviction prisoners—which arise under the Eighth Amendment—claims for deliberate indifference brought by state pretrial detainees arise under the Fourteenth Amendment." *Blake v. Kelly,* No. 12 Civ. 7245(ER), 2014 WL 4230889, at *4 (S.D.N.Y. Aug. 26, 2014). The Second Circuit has held that "[c]laims for deliberate indifference ... should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment." *Caiozzo v. Koreman,* 581 F.3d 63, 69–72 (2d Cir.2009).

■ "The Eighth Amendment requires that prison officials take 'reasonable measure to guarantee the safety of inmates in their custody.' " *Blake,* 2014 WL 4230889, at *4 (quoting *Hayes v. New York City Dep't of Corrs.,* 84 F.3d 614, 620 (2d Cir.1996)). "Accordingly, a prison official's failure to protect a prisoner from harm may form the basis of a § 1983 claim." *Id.* (citing *Farmer v. Brennan,* 511 U.S. 825, 833, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

■ "[P]rison officials have a duty to protect prisoners from violence at the hands of other prisoners." *Farmer,* 511 U.S. at 833, 114 S.Ct. 1970. "To state a failure-to-protect claim under § 1983, the plaintiff must establish two conditions: 'First, the plaintiff must demonstrate that he is incarcerated under conditions posing a substantial risk of serious harm. Second, the plaintiff must demonstrate that the defendant prison officials possessed [the] sufficient culpable intent' of deliberate indifference." *Randolph v. Griffin,* No. 12–CV–745S, 2014 WL 3548967, at *6 (W.D.N.Y. July 17, 2014) (quoting *Hayes,* 84 F.3d at 620).

■ In addition, "all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994). "In order to establish liability under this theory, a plaintiff must prove that the defendant in question (1) possessed actual knowledge of the use by another correction officer of excessive force; (2) had a realistic opportunity to intervene and prevent the harm from occurring; and (3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force." *Finley v. Perry,* No. 9:06–CV–1524(FJS/ATB), 2010 WL 6427496, at *5 (N.D.N.Y. July 13, 2010).

"[T]o recover damages against supervisory officials for the acts of their subordinates, a plaintiff must show that the defendant's personal involvement caused the constitutional deprivation." *Anderson,* 17 F.3d at 557.

### 1. August 7, 2008

■ Plaintiff's claims that Defendants Amico, Danehy, and Newton collaborated to delay a Code 1 response to allow Plaintiff to be attacked by other inmates may be liberally construed as a failure to protect claim. (Dkt. 95 at ¶¶ 30–32). Defendants argue that Plaintiff has "failed to plead any action which supports a deliberate indifference to protect him from other inmates." (Dkt. 119–2 at 17). The Court disagrees.

Plaintiff alleges that Defendants Newton, Amico, and Danehy were aware of the impending attack by inmates Eades and Members and permitted this attack to occur. (Dkt. 95 at ¶ 31). Plaintiff further claims that Defendant Newton planned the attack. (*Id.*). If these facts are taken as true, Plaintiff has sufficiently alleged that Defendants Amico, Danehy, and Newton failed to intervene to protect Plaintiff from an inmate attack and/or ·attack by Defendant Newton. To the extent that Plaintiff alleges a failure to protect claim in relation to the August 6, 2008 incident, that claim may proceed to discovery.

### 2. November 18, 2008

On November 7, 2008, Defendant Krenzer placed Plaintiff in second floor housing, and on November 18, 2008, Plaintiff was involved in a fight with two other inmates. (Dkt. 95 at ¶¶ 40–41).

As an initial matter, Plaintiff has failed to plead that Defendant Krenzer had any knowledge that placing Plaintiff in second floor housing posed a substantial risk of harm to Plaintiff. Further, Plaintiff has not alleged, beyond conclusory allegations, that Defendant Krenzer was deliberately indifferent to the harm that allegedly occurred as a result of the fight with two other inmates. As a result, Plaintiff's failure to protect claim related to the November 18, 2008, incident must be dismissed.

### 3. January 19, 2009

Plaintiff alleges that Defendants failed to protect him when they placed him in mainframe housing on December 26, 2009, despite his protests, and he was subsequently attacked by three inmates on January 19, 2009. (Dkt. 95 at ¶¶ 66, 43–44). Plaintiff claims that he informed Defendant Tripoli on December 26, 2008, that he did not want to return to mainframe housing, and that Defendant Tripoli essentially responded that he did not care if Plaintiff was assaulted by other inmates in mainframe housing. (*Id.* at ¶ 66). On

January 19, 2009, Plaintiff was attacked by three other inmates. (*Id.* at ¶ 43). Further, Plaintiff alleges that Defendants Waud and Willis "bragged" about Plaintiff getting beaten up on this occasion. (*Id.* at ¶ 44).

Here, Plaintiff has sufficiently alleged, for the purposes of this motion, that there was a substantial risk of harm. Plaintiff claims that Defendants were aware that gang activity was "rampant" in the mainframe housing, and Plaintiff was previously attacked in mainframe housing on at least one occasion. (*Id.* at ¶¶ 40–41, 61). Further, Plaintiff explicitly told Defendant Tripoli that he was concerned about being placed in mainframe housing. (*Id.* at ¶ 66).

Plaintiff has also sufficiently alleged deliberate indifference to this substantial risk of harm. For example, Plaintiff alleges that Defendant Tripoli stated that he did not care if Plaintiff was assaulted in the mainframe housing. (*Id.* at ¶¶ 43, 66).

To the extent that Plaintiff alleges a failure to protect claim in relation to the January 19, 2008, attack by three other inmates, Plaintiff's claim may proceed to discovery.

### 4. May 2, 2009

On May 2, 2009, Plaintiff claims that Defendant Willis not only failed to protect Plaintiff from having urine, feces, and dirty mop water thrown into Plaintiff's cell by inmate Clark, but that Defendant Willis also let inmate Clark out of his cell and directed him to throw these materials into Plaintiff's cell. (Dkt. 95 at ¶¶ 54–55).

Plaintiff has sufficiently alleged that he was exposed to a substantial risk of harm. *See Hogan v. Fischer*, 738 F.3d 509, 516 (2d Cir.2013) (finding spraying an inmate with vinegar, excrement, and machine oil was "repugnant to the conscience of mankind"). Further, based on Plaintiff's alle-

gations, Defendant Willis directed this exposure to occur. Alternatively, Defendant Willis was present while the exposure occurred, but failed to intervene. Accordingly, Plaintiff's failure to protect claim as against Defendant Willis may proceed to discovery.

### 5. August 12, 2009

In relation to Plaintiff's August 12, 2009 excessive use of force claim, Plaintiff alleges that Defendant Lipari was "watching and laughing" while Defendants Galen, Daly, and Alberti "dragged" Plaintiff back to his cell. (Dkt. 95 at ¶ 39).

Plaintiff has sufficiently pled a failure to protect claim as against Defendant Lipari. Plaintiff has alleged that Defendant Lipari was physically present for the use of force and therefore had actual knowledge of the use of force, had an opportunity to intervene to prevent the harm from occurring, but intentionally disregarded the risk by standing back and laughing while Plaintiff was attacked by the other Defendants. *See Finley,* 2010 WL 6427496, at *5. This claim may proceed to discovery.

### J. Retaliation

"Courts properly approach prisoner retaliation claims 'with skepticism and particular care,' because 'virtually any adverse action taken by a prison official— even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.'" *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (quoting *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)). "Thus, in order to survive a motion to dismiss a complaint, a plaintiff asserting First Amendment retaliation claims must allege '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3)

that there was a causal connection between the protected speech and the adverse action.'" *Davis,* 320 F.3d at 352 (quoting *Dawes,* 239 F.3d at 492).

"The filing of formal prisoner grievances is protected conduct under the First Amendment." *Shariff v. Poole,* 689 F.Supp.2d 470, 478 (W.D.N.Y.2010) (citing *Colon,* 58 F.3d at 872).

"Adverse action," defined objectively, is "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights.'" *Gill v. Pidlypchak,* 389 F.3d 379, 381 (2d Cir.2004) (quoting *Davis,* 320 F.3d at 353). "In other words, in the context of prisoner retaliation suits, a prisoner need not demonstrate 'actual chill.' The issue is whether defendants engaged in retaliatory conduct that would 'deter a similarly situated individual of ordinary firmness from exercising his constitutional rights.'" *Lashley v. Wakefield,* 483 F.Supp.2d 297, 300 (W.D.N.Y. 2007) (quoting *Gill,* 389 F.3d at 381).

"This objective inquiry is not static across contexts, but rather must be tailored to the different circumstances in which retaliation claims arise." *Dawes,* 239 F.3d at 493 (internal quotation omitted). "Prisoners may be required to tolerate more . . . than average citizens, before a [retaliatory] action taken against them is considered adverse." *Davis,* 320 F.3d at 353.

"[A] prisoner has a substantive due process right not to be subjected to false misconduct charges as retaliation for his exercise of a constitutional right such as petitioning the government for redress of grievances." *Jones v. Coughlin,* 45 F.3d 677, 679–80 (2d Cir.1995).

In evaluating whether a plaintiff has established the necessary causal

connection of a retaliation claim, "a court may infer an improper or retaliatory motive in the adverse action from: (1) the temporal proximity of the filing to the grievance and the disciplinary action; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant regarding his motive for disciplining the plaintiff." *Shariff*, 689 F.Supp.2d at 479. "The Second Circuit has held that temporal proximity between an inmate's grievance and disciplinary action may serve as circumstantial evidence of retaliation...." *Candelaria v. Higley*, No. 04–CV–0277(MAT), 2013 WL 104910, at *9 (W.D.N.Y. Jan. 8, 2013) (citing *Colon*, 58 F.3d at 872–73). Accordingly, "[a] plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action." *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir.2009).

### 1. October 11, 2009

Plaintiff contends that Defendant DeRosa placed him in SHU on October 11, 2009, in retaliation for the burglary of a family member that may have been committed by Plaintiff. (Dkt. 95 at ¶ 76). This tenuous and conclusory allegation of retaliation fails to state a claim because Plaintiff fails to allege that he was engaging in any protected speech or conduct. Instead, Plaintiff alleges that Defendant DeRosa retaliated against Plaintiff for a burglary. In the context alleged by Plaintiff, engaging in a criminal activity is not protected speech or conduct protected by the First Amendment. As a result, this retaliation claim is dismissed.

### 2. February 26, 2009

Plaintiff claims that on February 26, 2009, Defendant Waud permitted the theft of Plaintiff's commissary in retaliation for Plaintiff's filing of grievances. (Dkt. 95 at ¶ 46). According to Plaintiff, Waud had expressed his dislike for Plaintiff because Plaintiff filed grievances. (*Id.* at ¶ 46).

As previously noted, Plaintiff had engaged in a protected activity by filing grievances. In addition, the permitted theft of Plaintiff's commissary may be construed as an adverse action. Under the circumstances, these actions would be sufficient to chill a person of ordinary firmness from continuing to engage in his First Amendment activity.

Plaintiff has also sufficiently alleged a causal connection between his filing of grievances and the adverse action. Plaintiff alleges that Defendant Waud had indicated his dislike for Plaintiff because Plaintiff filed grievances, and it can be inferred from the other allegations in the complaint that this statement was made prior to the theft of Plaintiff's property. (*Id.* at ¶ 46). For the purposes of this motion, Defendant Waud's statement that Plaintiff was a "piece of shit that likes to file grievances on staff" prior to the theft of Plaintiff's commissary is sufficient to demonstrate Defendant Waud's motive to retaliate against Plaintiff. *See Shariff*, 689 F.Supp.2d at 479. Accordingly, Plaintiff's February 26, 2009 retaliation claim as against Defendant Waud may proceed to discovery.

### 3. DeRosa/Kluth Retaliation

Plaintiff does not specify a date, but claims that Defendant DeRosa identified Plaintiff by pointing to him, and that Defendant Kluth then "humiliated and degraded" Plaintiff for five to six hours before allegedly issuing two false misbehavior reports against Plaintiff. (*Id.* at ¶ 67). Construing this statement liberally, it appears that Plaintiff is alleging a retaliation claim.

Plaintiff does not state what protected activities he engaged in to elicit the

alleged retaliatory conduct, nor does he state when the retaliation occurred or the misbehavior reports were issued. "A prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report. The only way that false accusations contained in a misbehavior report can rise to the level of a constitutional violation is where the false accusation is based on something more, such as retaliation against the prisoner for exercising a constitutional right." *Tafari*, 714 F.Supp.2d at 372 (quotations and citations omitted).

Plaintiff's conclusory allegations are insufficient to state a retaliation claim. Plaintiff's allegations lack any specifics as to the protected activity and alleged retaliation. Under the circumstances, Plaintiff's retaliation claim against Defendants DeRosa and Kluth is simply not plausible.

### 4. March 2, 2009

■ On March 2, 2009, before being placed in SHU, Plaintiff was subjected to a strip search by Defendant Scally. (Dkt. 95 at ¶ 69). During the course of the strip search, Plaintiff felt that he was degraded and humiliated, and he subsequently filed a grievance against Defendant Scally. (Dkt. 95 at ¶ 92). Plaintiff alleges that later that day, Defendant Scally approached Plaintiff's cell and "blew-up his cheeks making jestures[sic] and stated: 'Oh Jessie suck my dick.'" (*Id.* at ¶ 92). Plaintiff also claims that Defendants Atkins, Scally, Guest, Amatore, and McGowan filed a false misbehavior report against Plaintiff in retaliation for Plaintiff's grievance against Defendant Scally, and that as a result of this false report, Plaintiff was placed in SHU on a shower and exercise deprivation order for over 30 consecutive days. (*Id.* at ¶¶ 80, 93).

As an initial matter, Defendant Scally's sexual comments and gestures do not constitute adverse action to sustain a retaliation claim. Insulting or disrespectful comments directed to an inmate do not rise to the level of an adverse action. *Davis*, 320 F.3d at 353 ("'sarcastic' comments, without more, do not constitute an adverse action."). However, Plaintiff has sufficiently alleged that he was subjected to the adverse action of a false misbehavior report in response to his protected activity of filing a grievance against Defendant Scally. *See Jones*, 45 F.3d at 679–80. Plaintiff has sufficiently alleged a causal connection between his protected activity and the adverse action because the events occurred within the course of one day. *See Espinal*, 558 F.3d at 129.

As a result, Plaintiff may proceed with his retaliation claim as against Defendants Atkins, Scally, Guest, Amatore, and McGowan, based upon events allegedly occurring on March 2, 2009.

### 5. April 16, 2009

■ Plaintiff alleges that Defendants Newton, Horan, Jolly, and Krenzer engaged in retaliation by issuing a false misbehavior report and placing Plaintiff on a shower and exercise deprivation order on April 16, 2009, after Defendant Atkins saw a copy of Plaintiff's legal petition earlier in the day. (Dkt. 95 at ¶¶ 85–86). Plaintiff further claims that Defendant Harling was notified of this alleged violation of Plaintiff's rights but failed to do anything in response. (*Id.* at ¶ 87).

Plaintiff's pursuit of legal remedies constitutes protected activity. As previously noted, the filing of a false misbehavior report constitutes an adverse action. *See Jones*, 45 F.3d at 679–80. However, Plaintiff has failed to allege facts to support a causal connection between his protected activity and the adverse action. Plaintiff claims that Defendant Atkins viewed his legal petition, not Defendants Newton, Horan, Jolly, or Krenzer. (Dkt. 95 at ¶¶ 85–86). Plaintiff has failed to allege that the individuals he claims filed a false

733

misbehavior report against him even had knowledge of his protected activity. Accordingly, his retaliation claim against Defendants Newton, Horan, Jolly, and Krenzer is dismissed. As a result, Plaintiff cannot state a claim against Defendant Harling, because there is no underlying violation of Plaintiff's rights. *See Murray,* 2007 WL 956941, at \*7.

### 6. May 4, 2009

Plaintiff alleges that Defendants Scally, Amatore, and Atkins engaged in retaliation by filing a false misbehavior report against Plaintiff on May 4, 2009, which resulted in Plaintiff being placed on a 23–day "styrofoam tray order." (Dkt. 95 at ¶¶ 58, 90).

Again, Plaintiff alleges that Defendants filed a false misbehavior report against him in retaliation for his filing of grievances. However, Plaintiff does not allege when the underlying grievances were filed in relation to when the false misbehavior report was issued, nor does Plaintiff indicate that he was "vindicated" on the matter, or that Defendants made a comment indicating retaliatory intent. *See Shariff,* 689 F.Supp.2d at 479. In other words, Plaintiff does not allege facts to support a causal connection between his protected activity and the adverse action.

Therefore, Plaintiff's retaliation claim as against Defendants Scally, Amatore, and Atkins related to the May 4, 2009 misbehavior report is dismissed.

### K. Denial of Due Process of Law

 "To establish a due process violation of the Fourteenth Amendment, an inmate must show that a government official made a deliberate decision to deprive him of his life, liberty, or property. Merely negligent conduct does not give rise to claims under the Fourteenth Amendment." *Jabbar v. Fischer,* 683 F.3d 54, 57 (2d Cir.2012) (citations omitted).

### 1. Liberty Interest

 "A prisoner's liberty interest is implicated by prison discipline, such as SHU confinement, only if the discipline imposes [an] atypical and significant hardship on the inmate in relations to the ordinary incidents of prison life." *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004) (quotation omitted). "Factors relevant to determining whether the plaintiff endured an atypical and significant hardship include the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions and the duration of the disciplinary segregation imposed compared to discretionary confinement." *Id.* (quotations omitted).

 SHU confinements of 30 to 90 days "fall within the 'short range' of disciplinary confinement and thus implicate a liberty interest only if 'the conditions were more severe than the normal SHU conditions.'" *Tafari,* 714 F.Supp.2d at 375 (quoting *Palmer,* 364 F.3d at 65).

### a. March 2, 2009 SHU Assignment

 Plaintiff claims that he was subjected to unconstitutional conditions of confinement when Defendants Hayes, Horan, Jolly, McGowan, Guest, Scally, Atkins, and Krenzer placed Plaintiff in SHU on a shower and exercise deprivation order for over 30 consecutive days. (Dkt. 95 at ¶ 80). Plaintiff alleges that these conditions caused him "extreme outrageous emotional distress, physical suffering and mental anguish." (*Id.* at ¶ 80).

"Although courts should accord deference to prison officials in determining whether restrictions imposed upon a pretrial detainee are reasonably related to a legitimate governmental objective, the Second Circuit has held that an extreme restriction may smack of punishment so as to warrant a factual inquiry into whether such a restriction is actually related to a

legitimate governmental interest." *Valdez v. City of New York*, No. 11–CV–5194, 2014 WL 2767201, at *2 (S.D.N.Y. June 17, 2014).

Here, the 30–day consecutive assignment to SHU is considered a "short term" assignment to SHU, and did not deny Plaintiff a liberty interest. As a result, Plaintiff may only sustain a due process claim with respect to this period of SHU time if he was subjected to abnormal conditions in SHU. At least at this stage of the litigation, Plaintiff has plausibly alleged such abnormal conditions. Plaintiff alleges that he was deprived of shower and exercise for over 30 consecutive days, a time frame that extends far beyond the two week timeframe found acceptable for such deprivations in this Circuit. *See Flake v. Peck*, No. 9:12–cv–00517 (MAD/ATB), 2014 WL 1289582, at *22 (N.D.N.Y. Mar. 31, 2014) ("[T]his Circuit has rejected claims of shower deprivation, lasting up to two weeks.") (collecting cases); *Johnson v. Colvin*, No. 09–CV–6413–CJS, 2013 WL 775357, at *4 (W.D.N.Y. Feb. 28, 2013) ("temporary deprivations of showers for periods of approximately two weeks . . . do not satisfy the objective component of a claim of cruel and unusual punishment"); *Gardner v. Mental Health Unit of Sullivan Corr. Facility*, No. 07 Civ. 5535(WHP), 2009 WL 1834382, at *2 (S.D.N.Y. June 17, 2009) ("denying a prisoner the opportunity to shower for seven days and withholding toiletries, while uncomfortable, does not endanger an inmate's health and safety").

Plaintiff may proceed with his due process claim as against Defendants Hayes, Horan, Jolly, McGowan, Guest, Scally, Atkins, and Krenzer with respect to his 30–day consecutive SHU assignment that began on March 2, 2009.

**b. SHU Assignments November 27, 2008 through August 30, 2009**

In addition to the March 2, 2009 SHU assignment, Plaintiff objects to the various SHU assignments he received between November 27, 2008 and August 30, 2009. (Dkt. 95 at ¶ 97). All but one of the assignments he contests has previously been examined and affirmed by the state courts. As a result, those claims are barred by the doctrine of collateral estoppel.

Even if Plaintiff's claims were not barred by collateral estoppel, none of the assignments to SHU that Plaintiff objects to extend beyond the "short range" of disciplinary confinement, nor does Plaintiff allege that he was subjected to abnormal conditions as to these particular assignments, and as a result, Plaintiff's allegations do not implicate a liberty interest. (*See* Dkt. 95 at ¶¶ 97(a)(30 days); (b)(30 days); (c)(7 days); (d)(14 days); (e)(20 days); (f)(30 days); (g)(42 days); (h)(20 days); (i)(20 days)). The single SHU assignment that Plaintiff had not contested in a prior state action resulted from a March 14, 2009 hearing imposing 14 days of SHU time. (Dkt. 95 at ¶ 97(d)). This 14 day assignment does not implicate a liberty interest, and furthermore, Plaintiff does not allege that he was subjected to abnormal conditions.

**2. Due Process**

 "The procedural safeguards to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are well established, the contours of the requisite protections having been articulated in *Wolff v. McDonnell*, 418 U.S. 539, 564–69 [94 S.Ct. 2963, 41 L.Ed.2d 935] (1974)." *Graham*, 2013 WL 5924727, at *2. The constitutionally mandated due process requirements include: "(1) written notice of the charges to the inmate; (2) the opportunity to appear at a disciplinary hearing and present wit-

nesses and evidence in support of his defense, subject to a prison facility's legitimate safety and penological concerns; (3) a written statement by the hearing officer explaining his decision and the reasons for the action being taken; and (4) in some circumstances, the right to assistance in preparing a defense." *Id.*

### a. October 11, 2008

Plaintiff claims that he was placed in SHU on October 11, 2008, without due process of the law. (Dkt. 95 at ¶ 77). Although Plaintiff makes the conclusory statement that his constitutional rights were violated, Plaintiff does not allege how his due process rights were violated. Accordingly, this claim is dismissed.

### b. November 19, 2008

 Plaintiff argues that his placement in SHU on November 18, 2008, was in violation of his due process rights. (Dkt. 95 at ¶ 65). Plaintiff further contends that he was supposed to be released from SHU on December 17, 2008, but was kept in SHU until December 23, 2008 "without adequacy of any due process of law" as a result of Defendant Atkins filing false reports and log entries. (*Id.* at ¶ 77). Here, Plaintiff's due process claims are primarily based on his allegations that the charges against him were false, and were based on false misbehavior reports. (*See e.g.,* Dkt. 95 at ¶¶ 47, 58, 80, 93). "However, even if the charges were false, this does not amount to a due process violation as long as plaintiff was afforded a fair opportunity to refute the charges." *Graham,* 2013 WL 5924727, at *2. Plaintiff does not allege that he was denied a fair opportunity to refute the charges against him. Accordingly, his claim is dismissed.

### c. March 2009—August 2009 Conditions

 Plaintiff alleges that the requirement that he remain in full mechanical restraints during his isolated morning exercise period from March 2009 through August 2009, violated his rights under the due process and equal protection laws of the New York State and United States Constitutions. (Dkt. 95 at ¶ 88).

Plaintiff does not allege what facts or circumstances led up to this requirement, nor does he allege how he was prevented from exercising his rights under the due process clause in relation to this requirement. Accordingly, Plaintiff's due process claim with respect to this requirement is dismissed.

### d. Administrative Hearings November 27, 2008 through August 30, 2009

Plaintiff alleges that Defendants violated a laundry list of New York regulations as well as the Fourteenth Amendment during nine administrative hearings conducted between November 27, 2008 and August 30, 2009. (Dkt. 95 at ¶ 97). Again, Plaintiff's concerns about all but one of these hearings were previously addressed in his state court proceedings. Accordingly, Plaintiff may only raise due process claims as to the March 14, 2009 hearing in this action, which was not previously addressed in state court. Plaintiff does not raise any factual allegations to describe how his due process rights were violated at the March 14, 2009 hearing. As a result, Plaintiff's claim is dismissed.

### e. Lack of Supervisory Response to Plaintiff's Complaints

Plaintiff claims that he filed numerous grievances, complaints, and appeals with Defendants Harling and Krenzer in relation to the alleged mistreatment by Defendants Atkins, Scally, Newton, Willis, Guest, Amatore, and DeRosa, but states that Defendants Harling and Krenzer continued to show "deliberate indifference" to Plaintiff's concerns. (*Id.* at ¶ 59).

These claims against Defendants Harling and Krenzer are dismissed. As previously noted with respect to Defendant O'Flynn, "the receipt of letters or grievances, by itself, does not amount to personal involvement." *Mateo*, 682 F.Supp.2d at 430 (citing *Sealey*, 116 F.3d at 51). The mere fact that Defendants Harling and Krenzer received Plaintiff's numerous grievances, complaints, and appeals does not impute personal involvement to these Defendants. *See Dorsey v. Fisher*, No. 9:09–CV–1011GLSDEP, 2010 WL 2008966, at *12 (N.D.N.Y. May 19, 2010) ("An allegation that an official ignored a prisoner's letter of protest or a request for an investigation of allegations contained in the letter is insufficient to hold that official liable for the alleged violations."). To the extent that Plaintiff asserts claims against these Defendants for their failure to respond to his complaints, these claims are dismissed.

Plaintiff also claims that Defendants Lipari and Harling provided fraudulent responses to Plaintiff's grievance 09–33, and excluded four witness statements in connection with Plaintiff's grievance 09–49, contributing to Defendant County of Monroe's "faulty" grievance program. (*Id.* at ¶ 94).

Plaintiff's conclusory allegations are not supported by any factual allegations as to how the alleged responses were fraudulent, or how the testimony of the four witnesses who were allegedly excluded would have provided him due process. As a result, this claim is also dismissed.

### f. Improper Investigations

Plaintiff alleges that Defendants Lipari, Guest, S. Peck, and Shellard did not appropriately conduct their investigations against supervisors in relation to Plaintiff's grievances 09–01, 09–32, 09–35, 09–46, 09–49, 09–81, 09–88, and 09–89, in violation of Plaintiff's rights under 7 NYCRR § 701.8(d)(1) and the First and Fourteenth Amendments to the U.S. Constitution.

(*Id.* at ¶ 95). "[A]n inmate has no constitutional right to have his grievances processed or investigated in any particular manner." *Green*, 677 F.Supp.2d at 639 (internal quotations and citation omitted). Further, Plaintiff does not allege how the investigations were improper. Accordingly, these claims are dismissed.

Plaintiff generally claims that the investigation into his grievance 09–01 was biased and prejudiced, in violation of his right to redress of grievances. (*Id.* at ¶ 96).

"Claims of hearing officer bias are common in § 1983 cases by inmate plaintiffs, and where they are based on purely conclusory allegations, they are routinely dismissed." *Washington*, 968 F.Supp.2d at 541–42. "An inmate's own subjective belief that the hearing officer was biased is insufficient to create a genuine issue of material fact." *Booker*, 2014 WL 1289579, at *11. As a result, this claim is dismissed.

### L. Equal Protection

 "The equal protection clause directs state actors to treat similarly situated people alike. To prove an equal protection violation, claimants must prove purposeful discrimination, directed at an identifiable or suspect class." *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995) (citations omitted). "In other words, '[t]o prove a violation of the Equal Protection Clause ... a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination.'" *Randle*, 960 F.Supp.2d at 476 (quoting *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir.2005) (citation omitted)).

 "Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *City of Cuyahoga Falls v. Buckeye Cmty.*

*Hope Found.,* 538 U.S. 188, 194, 123 S.Ct. 1389, 155 L.Ed.2d 349 (2003) (quotation omitted).

██ Here, Plaintiff makes various claims that he has been discriminated against because he is a racial minority, and that other racial minorities are similarly discriminated against. (*See, e.g.* Dkt. 95 at ¶¶ 71–74). However, Plaintiff never makes any allegations of fact to support a racially discriminatory intent or purpose for the application of otherwise neutral policies. For example, Plaintiff alleges in a conclusory fashion that racial minorities are disproportionately placed in SHU and subsequently deprived of access to public information; however, Plaintiff does not allege that non-minority inmates who commit similar policy violations were not also placed in SHU and subject to the same deprivations. (*Id.* at ¶ 73). As a result, to the extent that Plaintiff alleges violations of the equal protection clause or discrimination, these claims are dismissed.

Plaintiff alleges that the requirement that he remain in full mechanical restraints during his isolated morning exercise period from March 2009 through August 2009 violated his rights under the due process and equal protection laws of the New York State and United States Constitutions. (*Id.* at ¶ 88). However, beyond making this conclusory allegation, Plaintiff does not explain how this requirement in any way injured him or violated his rights. Accordingly, any claim Plaintiff may allege as to the requirement that he remain in full mechanical restraints during exercise from March 2009 through August 2009 is dismissed.

### M. Conditions of Confinement

 Under the Eighth Amendment, officials may not "create inhumane prison conditions, deprive inmates of basic necessities, or fail to protect their health or safety." *Overton v. Bazzetta,* 539 U.S.

126, 137, 123 S.Ct. 2162, 156 L.Ed.2d 162 (2003). However, "because society does not expect or intend prison conditions to be comfortable, only extreme deprivations are sufficient to sustain a conditions-of-confinement claim." *Blyden v. Mancusi,* 186 F.3d 252, 263 (2d Cir.1999). "To state an Eighth Amendment claim based on conditions of confinement, an inmate must allege that: (1) objectively, the deprivation the inmate suffered was sufficiently serious that he was denied the minimal civilized measure of life's necessities, and (2) subjectively, the defendant official acted with a sufficiently culpable state of mind, such as deliberate indifference to inmate health or safety." *Walker v. Schult,* 717 F.3d 119, 125 (2d Cir.2013) (internal quotations omitted).

The Second Circuit has explained:

To meet the objective element, the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health. Thus, prison officials violate the Constitution when they deprive an inmate of his 'basic human needs' such as food, clothing, medical care, and safe and sanitary living conditions. There is no static test to determine whether a deprivation is sufficiently serious; the conditions themselves must be evaluated in light of contemporary standards of decency. Moreover, conditions of confinement may be aggregated to rise to the level of a constitutional violation, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise.

To meet the subjective element, the plaintiff must show that the defendant acted with more than mere negligence. To constitute deliberate indifference, the prison official must know of, and disregard, an excessive risk to inmate health

or safety. Evidence that the risk was obvious or otherwise must have been known to a defendant may be sufficient for a fact finder to conclude that the defendant was actually aware of the risk.

*Id.* (quotations and citations omitted).

### 1. December 23, 2008

 Plaintiff asserts a conditions of confinement claim, insofar as he alleges that after he was released from SHU on December 23, 2008, he was placed in a cell that was "atrociously unsanitary disgustingly filthy with excrement, urine, feces and spew all over walls, ceiling, floor and bars for (3) three more consecutive days where ventilation system were non-existent and cell smell toxicly[sic] aweful[sic] . . . ." (Dkt. 95 at ¶ 60). Defendants argue that Plaintiff has failed to meet his burden to allege that he suffered a serious deprivation and that the officials who caused the harm did so with deliberate indifference to Plaintiff's health or safety. (Dkt. 119–2 at 19).

 "[U]nsanitary conditions in a prison cell can, in egregious circumstances, rise to the level of cruel and unusual punishment." *Walker,* 717 F.3d at 127. At this stage in the litigation, Plaintiff has alleged the objective prong of his conditions of confinement claim. Plaintiff has alleged that he was exposed to human excrement and bodily fluids in a poorly ventilated cell over the course of multiple days. *See Gaston v. Coughlin,* 249 F.3d 156, 166 (2d Cir.2001) ("We are unwilling to adopt as a matter of law the principle that it is not cruel and unusual punishment for prison officials knowingly to allow an area to remain filled with sewage and excrement for days on end.").

Although Plaintiff has not specifically alleged that Defendants had knowledge of this condition, Defendants' knowledge may be inferred by the simple fact that these Defendants must have viewed the conditions of the cell when they placed Plaintiff in it. *See Brock v. Wright,* 315 F.3d 158, 164 (2d Cir.2003) ("[E]vidence that the risk was obvious or otherwise must have been known to a defendant is sufficient to permit a jury to conclude that the defendant was actually aware of it."); *see also Gaston,* 249 F.3d at 166 (finding Plaintiff's allegation that defendant prison guards "made daily rounds of SHU" was sufficient to allege that defendants had actual knowledge of the inhumane conditions). Plaintiff has sufficiently pled that Defendants Jolly, Horan, Kaiser, DeRosa, McGowan, Knapp, Kennelly, Cardella, S. Peck, and Tripoli disregarded Plaintiff's safety by leaving him housed in these unsanitary conditions. (Dkt. 95 at ¶ 60).

### 2. February 27, 2009—March 2, 2009

 Plaintiff alleges that he was subjected to poor conditions of confinement when he was inappropriately housed in a booking cell on a shower and exercise deprivation order by Defendants T. Peck, Mooney, Waud, Dimartino, and Jolly from February 27, 2009 through March 2, 2009. (*Id.* at ¶ 79).

To the extent Plaintiff alleges that his inability to shower over the course of four days constitutes a constitutional deprivation, his claim must fail. Even a two-week suspension of shower privileges does not constitute a denial of "basic hygienic needs." *McCoy,* 255 F.Supp.2d at 260 (citing *Cruz v. Jackson,* No. 94 Civ. 2600(RWS), 1997 WL 45348, at *6 (S.D.N.Y. Feb. 5, 1997)). Similarly, Plaintiff's exercise deprivation over the course of four days does not rise to the level of an objective constitutional violation. *See Dillon v. City of New York,* No. 12 Civ. 6746(LAP), 2013 WL 3776252, at *4 (S.D.N.Y. July 18, 2013) ("Courts have held that deprivation of exercise for peri-

ods as long as fourteen days does not violate the Eighth Amendment.").

In addition, Plaintiff has entirely failed to allege the subjective portion of his claim; only arguing that he was "housed in booking" by Defendants. (Dkt. 95 at ¶ 79).

Accordingly, Plaintiff's conditions of confinement claim related to his SHU housing from February 27, 2009 through March 2, 2009, is dismissed.

### 3. Lighting in SHU

Plaintiff claims that the conditions in SHU are extreme, insofar as the lights above the beds remain on 24 hours per day, allegedly causing "sleeplessness excruciating headaches, eye pains, anxiety, mental anguish and endless pain and suffering." (Dkt. 95 at ¶ 73). Defendants do not directly address Plaintiff's allegations, stating only that Plaintiff "makes broad conclusions" including statements about "lack of reading materials, lighting, and one incident of a strip search...." (Dkt. 119–2 at 19). Defendants generally argue that Plaintiff failed to meet his burden to demonstrate a serious deprivation and deliberate indifference as to all allegations of unsanitary conditions. (*Id.*). Defendants have failed to sufficiently argue that Plaintiff has failed to state a claim.

 "[S]leep is critical to human existence, and conditions that prevent sleep have been held to violate the Eighth Amendment." *Walker*, 717 F.3d at 126 (citing *Tafari*, 714 F.Supp.2d at 367). "Requiring inmates to live in constant illumination can also, under certain circumstances, rise to the level of an Eighth Amendment violation." *Jones v. Rock*, No. 9:12–cv–0447 (NAM/TWD), 2013 WL 4804500, at *10 (N.D.N.Y. Sept. 6, 2013) (collecting cases). Accordingly, Plaintiff has sufficiently alleged a conditions of confinement claim under the Fourteenth Amendment with respect to his allegations that he was subjected to extreme conditions in SHU by way of the 24 hour lighting by Defendants Harling, Krenzer, Thomas, Jolly, Horan, Dimartino, and Lipari.

### N. Verbal Threats
#### 1. February 26, 2009

 Plaintiff alleges that Defendants Waud, DeRosa, and Thibaut made various verbal threats against him on February 26, 2009. Plaintiff claims that Defendant Waud called Plaintiff a "piece of shit that likes to file grievances on staff." (Dkt. 95 at ¶ 46). Plaintiff alleges that Defendant DeRosa stated: "Hey Jessie I see you got your ass kicked that is good for you they did a pretty good job this time." (*Id.* at ¶ 49). Plaintiff does not allege that these statements caused him any injury.

Although these comments do not clearly represent threats, to the extent that the complaint may be read to allege an Eighth Amendment claim against Defendants Waud or DeRosa based on their alleged verbal harassment of Plaintiff on February 26, 2009, such conduct is not actionable under § 1983. *McCoy*, 255 F.Supp.2d at 261; *see also Harris v. Keane*, 962 F.Supp. 397, 406 (S.D.N.Y.1997) ("Allegations of threats, verbal harassment of profanity, without any injury or damage, do not state a claim under § 1983.").

Plaintiff also claims that Defendant Thibaut was discussing a movie with Defendant Raby when he stated: "Oh he got his ass kicked and fell back down to earth, like somebody on 3M just got their ass kicked." (Dkt. 95 at ¶ 51). Plaintiff claims that this statement caused him to violently "shake uncontrollably." (*Id.* at ¶ 51). "It is well settled law in this Circuit that '42 U.S.C. § 1983 is not designed to rectify harassment or verbal abuse.'" *Murray*, 2007 WL 956941, at *8 (quoting *Gill v. Hoadley*, 261 F.Supp.2d 113, 129 (N.D.N.Y.2003)). Here, Defendant Thibaut's comment is not a threat so much as it is a comment, albeit

an arguably insensitive one. This comment alone cannot sustain a constitutional claim. As this is the only claim raised against Defendant Thibaut, Defendant Thibaut is dismissed from this lawsuit.

### 2. May 2, 2009

Plaintiff alleges that Defendant Gatti stood in front of Plaintiff's cell on May 2, 2009, called Plaintiff a "nigger," and said that he would kill Plaintiff. (Dkt. 95 at ¶ 56). It is well-settled that verbal harassment and name-calling on the part of prison officials do not constitute actionable constitutional violations. *See Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986). However, Defendant Gatti's alleged threat that he would kill Plaintiff presents a closer question.

 "Verbal harassment itself does not rise to the level of a constitutional violation. Verbal abuse, vulgarity, and even threats are insufficient to rise to the level of constitutional violations." *DeJesus v. Tierney,* No. 9:04–CV–298, 2006 WL 839541, at *11 (N.D.N.Y. Mar. 28, 2006); *see also Kemp v. LeClaire,* No. 03–0844, 2007 WL 776416, at *15 (W.D.N.Y. Mar. 12, 2007) (statements like "your day is coming," "you'll be sent to your mother in a black box," and "you'll get your black ass kicked" not adverse actions). *Cf. Ford v. Palmer,* 539 Fed.Appx. 5, 6 (2d Cir.2013) (direct threat to poison inmate-plaintiff constituted an adverse action).

Defendant Gatti's alleged statement that he would kill Plaintiff is too general to support a constitutional claim. Plaintiff alleged that he had never interacted with Defendant Gatti before, and he does not allege that he interacted with Defendant Gatti again. In fact, this alleged threat is the only time Plaintiff even references Defendant Gatti in his complaint. (Dkt. 95 at ¶ 56). "[P]laintiff has not alleged that he was ever physically threatened and, without more, his allegations of verbal threats, abusive language and racial epithets cannot form the basis of a section 1983 claim." *Amaker v. Foley,* No. 94–CV–0843E(SR), 2003 WL 21383010, at *4 (W.D.N.Y. Feb. 18, 2003). Accordingly, Plaintiff's claim against Defendant Gatti is dismissed.

### O. Falsification of Medical Records

Plaintiff alleges that on February 26, 2009, former Defendant Muller deliberately omitted an incident where Plaintiff was vomiting blood from her medical notes in order to downplay his injuries. (*Id.* at ¶ 103). Plaintiff voluntarily dismissed Ms. Muller with prejudice, and Ms. Muller was dismissed from this matter by Court order on July 12, 2013. (Dkt. 135). Plaintiff does not allege that any other Defendants engaged in falsification of medical records. As a result, Plaintiff's falsification of medical records claim is dismissed.

### P. Qualified Immunity

 Defendants assert that they are entitled to qualified immunity on all of Plaintiff's claims because any conduct was made in the course of their employment and "did not reasonably violate established law." (Dkt. 119–2 at 10). "Although ... claims of qualified immunity should be decided as early as possible in a case, it would be premature to dismiss the case now on this basis. Rather, ... qualified immunity is often best decided on a motion for summary judgment when the details of the alleged deprivations are more fully developed." *Walker,* 717 F.3d at 130.

Because the Court finds that Plaintiff's complaint plausibly alleges several causes of action, further facts are required to decide the question of qualified immunity. For example, if Defendant Newton premeditated the attack on Plaintiff on August 7, 2008, this would clearly be outside of the scope of Defendant Newton's employment, and thus would not entitle Defendant Newton to qualified immunity.

Accordingly, Defendant's request for judgment on the pleadings on the basis of qualified immunity is denied.

### III. Defendant Ellie Holman's Motion for Judgment on the Pleadings

At the time of Plaintiff's pre-trial holding at MCJ, Defendant Ellie Holman ("Ms. Holman") was employed by CMC as a registered nurse assigned to work at MCJ. (Dkt. 120–1 at ¶ 3).[3] In his complaint, Plaintiff claims that Ms. Holman "with shocking repugnant and reckless callous disregard blurted out following statement: 'Oh Jessie Barnes always gets his ass kicked'" when he arrived at the nurse's station for treatment after an altercation. (Dkt. 95 at ¶ 53). However, Plaintiff does not state how this alleged comment by Ms. Holman (which Ms. Holman denies (Dkt. 102 at ¶ 53)) impacted his rights. · Further, as Ms. Holman notes, Plaintiff has failed to allege that she denied him medical care or provided him with inadequate medical care. (Dkt. 120–1 at ¶ 137). As a result, Plaintiff has entirely failed to state a claim with regard to Ms. Holman, and Ms. Holman's motion for judgment on the pleadings is granted.

### IV. Plaintiff's Request to Convert Defendants' Motion for Judgment on the Pleadings into a Motion for Summary Judgment

Plaintiff requests that the Court convert Defendants' motion for judgment on the pleadings into a motion for summary judgment and grant Plaintiff summary judgment on the basis of "ample evidence against the Defendants" and Defendants'

"generalized and conclusory motion to dismiss." (Dkt. 133–3 at 33).

"A district court must convert a motion for judgment on the pleadings into one for summary judgment if the motion includes material 'outside the pleadings' and that material is 'not excluded by the court.'" *Sira,* 380 F.3d at 66 (quoting Fed.R.Civ.P. 12(d)).

Here, there is no basis to convert Defendants' motion into a motion for summary judgment. To the extent that Plaintiff seeks summary judgment in his favor, this request is denied without prejudice as premature. *See Brunson v. Jonathan,* 727 F.Supp.2d 195, 199 (W.D.N.Y.2010) ("Factual issues remain to be decided with respect to the merits of [Plaintiff's] claims. Whether those issues may at some point be properly disposed of on a motion for summary judgment, on a more complete record than the one before [the Court], remains to be seen, but at this point summary judgment would plainly be premature.").

### CONCLUSION

For the foregoing reasons, County Defendants' motion (Dkt. 119) is granted in part and denied in part, Defendant Holman's motion (Dkt. 120) is granted, Plaintiff's motion for recusal (Dkt. 142) is denied, and Plaintiff's request to convert his response into a motion for summary judgment (Dkt. 133) is denied.

The Clerk of Court is directed to lift the stay of discovery (Dkt. 138).

The following claims may proceed to discovery: (1) August 7, 2008 Excessive Use of Force against Defendant Newton;

---

3. Ms. Holman was not named as a defendant in Plaintiff's original complaint, however, Judge Siragusa added Ms. Holman as a named defendant in place of "Jane Doe Nurse working on February 27, 2009" at paragraphs 16, 61, and 62 of Plaintiff's second amended complaint, by Court order. (Dkt. 92). Plaintiff then incorporated Ms. Holman by name in his third amended complaint. (Dkt. 95 at ¶ 53).

(2) August 12, 2009 Excessive Use of Force against Defendants Shellard, Daly, Galen, and Alberti; (3) August 7, 2008 Conspiracy against Defendants Amico, Danehy, and Newton; (4) August 7, 2008 Failure to Protect against Defendants Amico, Danehy, and Newton; (5) January 19, 2009 Failure to Protect against Defendants Tripoli, Waud, and Willis; (6) May 2, 2009 Failure to Protect against Defendant Willis; (7) August 12, 2009 Failure to Protect against Defendant Lipari; (8) February 26, 2009 Retaliation against Defendant Waud; (9) March 2, 2009 Retaliation against Defendants Atkins, Scally, Guest, Amatore, and McGowan; (10) December 23, 2008 Conditions of Confinement claim against Defendants Jolly, Horan, Kaiser, DeRosa, McGowan, Knapp, Kennelly, Cardella, S. Peck, and Tripoli; (11) Conditions of Confinement lighting claim against Defendants Harling, Krenzer, Thomas, Jolly, Horan, Dimartino, and Lipari; and (12) Due Process claim as against Defendants Hayes, Horan, Jolly, McGowan, Guest, Scally, Atkins, and Krenzer with respect to Plaintiff's 30–day consecutive SHU assignment that began on March 2, 2009. The Court has considered Plaintiff's remaining claims and finds them to be without merit.

The Clerk of Court is further directed to terminate Defendants County of Monroe, Brooks, O'Flynn, Caceci, Kloner, Mooney, Kimball, Gatti, Pratt, Inipoli, Preston, T. Peck, Carlo, Messura, Kluth, Luther, Raby, Fitzsimmons, Palma, DiFlores, Jane Doe Nurse, Nurse Mary, Domalski, Meister, Robinson, Holman, Miller, Rizzo, and Thibaut as parties to this action.

SO ORDERED.